13 CV 3327

RECEIVED
MAY 16 2013
PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## MOHAMMED QUADIR

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

## New York State Dept. of Labor

_____

_____

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant. Addresses should not be included here.)*

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

Jury Trial: ☑ Yes ☐ No

*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

_____ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:*** *In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
***NOTE:*** *In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
***NOTE:*** *In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

## I.   Parties in this complaint:

A.   List your name, address and telephone number.  Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff   Name   MOHAMMED QUADIR
Street Address   120 Alcott Place, Apt. 2A
County, City   Bronx County, Bronx
State & Zip Code   New York   10475 - 4247
Telephone Number   646 - 327 - 3667

B.   List all defendants' names and the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Defendant   Name   NYS Dept. of Labor
Street Address   Attn: Director of Human Resources
County, City   Building 12, State Campus, Room 509
State & Zip Code   Albany, NY   12240
Telephone Number   518- 457-9000 or 888-469-7365

→ address presently employ

C.   The address at which I sought employment or was employed by the defendant(s) is:

Employer   NYS Labor Dept
Street Address   400 East Fordham Road, 8th Floor
County, City   Bronx County, Bronx
State & Zip Code   New York   10458 - 5039
Telephone Number   718- 960 - 7901

## II.   Statement of Claim:

State as briefly as possible the facts of your case, including relevant dates and events.  Describe how you were discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts to support those claims.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A.   The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____   Failure to hire me.

_____   Termination of my employment.

_____   Failure to promote me.

☒   Failure to accommodate my disability.

☒   Unequal terms and conditions of my employment.

_____   Retaliation.

_____   Other acts *(specify)*: _____.

*Note:   Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.   It is my best recollection that the alleged discriminatory acts occurred on: **Feb. 14, '12**
                                                                                           *Date(s)*

C.   I believe that defendant(s) *(check one)*:

   ✗   is still committing these acts against me.

   _____   is not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

   ☐   race _____   ☐   color _____

   ☐   gender/sex _____   ☐   religion_____

   ☐   national origin _____

   ☐   age.   My date of birth is _____   *(Give your date of birth only if you are asserting a claim of age discrimination.)*

   ✗   disability or perceived disability, **Major Depressive Disorder** *(specify)*

E.   The facts of my case are as follow *(attach additional sheets as necessary)*:

See the Attached three documents: (1) May 18, '12 Nys Human Rights Division Complaint (Read this first); (2) Labor Dept's 8-page Position Statement along with 84 pages of Exhibits; and (3) My Sept. 14, 2012 Rebuttal (Read the rebuttal last.)

_____

_____

*Note:   As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.   Exhaustion of Federal Administrative Remedies:

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: **May 18, 2012** _____ *(Date)*.

B.      The Equal Employment Opportunity Commission *(check one)*:

_____       has not issued a Notice of Right to Sue letter.

____X____       issued a Notice of Right to Sue letter, which I received on **Feb. 23, 2013** *(Date)*.

> *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity*
> *Commission to this complaint.*

C.      Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____       60 days or more have elapsed.

_____       less than 60 days have elapsed.

## IV.   Relief:

**WHEREFORE**, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _____

① Approval of my request for reasonable accommodation
② $125 thousand in damages ③ All legal and/or attorney's fees.

*(Describe relief sought, including amount of damages, if any, and the basis for such relief!)*


I declare under penalty of perjury that the foregoing is true and correct.

Signed this **16** day of **May**, 20**13**

Signature of Plaintiff    **Mohammed Quadir**

Address    **120 Alcott Place**
           **Apt. 2A**
           **Bronx, NY 10475-4247**

Telephone Number    **646-327-3667**

Fax Number *(if you have one)*    **NA**

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Mohammed Quadir<br>120 Alcott Place, Apt. # 2-A<br>Bronx, NY 10475 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2012-03537 | Holly M. Woodyard,<br>Investigator | (212) 336-3643 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry,*
**Kevin J. Berry,**
**District Director**

February 21, 2013
*(Date Mailed)*

Enclosures(s)

cc:

| **NEW YORK STATE, DEPARTMENT OF LABOR**<br>**Attn: Director of Human Resources**<br>**Building 12, State Campus, Room 509**<br>**Albany, NY 12240** | **NEW YORK STATE, DEPARTMENT OF LABOR**<br>**Attn: Director of Human Resources**<br>**P.O. Box 15130**<br>**Albany, NY 12212-5130** |
|---|---|

Read East

May 18, '12 DHR
complaint
Doc # 1 of 3

RECEIVED
MAY 1 8 REC'D
HOUSING UNIT

## New York State Division of Human Rights
## Complaint Form

RECEIV
MAY 1 8 2012
INTAKE UNIT

### CONTACT INFORMATION

**My contact information:**

Name: MOHAMMED QUADIR

Address: 120 Alcott Place        Apt or Floor #: 2A

City: Bronx        State: NY        Zip: 10475 - 4247

### REGULATED AREAS

**I believe I was discriminated against in the area of:**

[X] Employment          [ ] Education          [ ] Volunteer firefighting

[ ] Apprentice Training   [ ] Boycotting/Blacklisting   [ ] Credit

[ ] Public Accommodations   [ ] Housing          [ ] Labor Union, Employment
*(Restaurants, stores, hotels, movie*                                    Agencies
*theaters amusement parks, etc.)*   [ ] Commercial Space

**I am filing a complaint against:**

Company or Other Name: NYS Dept. of Labor

Address: 358 East 149th Street, 2nd Floor

City: Bronx        State: NY        Zip: 10455

Telephone Number: 718 960 7099
(area code)

**Individual people who discriminated against me:**

Name: Ms. Noemi Ramos        Name: Mr. Joseph Kabance

Title: Supervising Labor        Title: Affirmative Action Administrator 3
Services Representative

### DATE OF DISCRIMINATION

The most recent act of discrimination happened on: Feb. 14 '12
month   day   year

3

# DOMESTIC WORKERS

 *Please answer the questions on this page **only if you are a domestic worker**. If you are not a domestic worker, please skip this page and turn to the next page.*

The Human Rights Law protects you if you are being sexually harassed or harassed because of your gender, race, national origin, or religion AND you are employed in the home or residence of another person for the purposes of housekeeping, childcare, companionship, or any other domestic service purpose

**Do you live in your employer's home?**  ☐ Yes    ☐ No

*If yes, please be sure to fill out the information on <u>Page 11</u> and provide the name of another person who does not live with you but will know how to contact you if the Division needs to reach you.*

**What did the person you are complaining against do?**
*Please check all that apply.*

☐ Harassed me because of my race or color    ☐ Harassed me because of my national origin

☐ Harassed me because of my religion    ☐ Harassed me because of my gender/sex

☐ Sexually harassed me

**Other protections for Domestic Workers:**

As a domestic Worker, you are also entitled to certain protections in the following areas:

- **Minimum Wage** (the lowest hourly wage under the law)
- **Day of Rest** (the amount of time off that you should have each week)
- **Paid Vacation** (the amount of time off that you should have each year)
- **Overtime Pay** (extra money that you receive for working extra hours)
- **Disability Benefits** (payments if you can't work because of illness or injuries)

If you have questions about these topics, please contact:

**New York State Department of Labor**
(518) 457-9000
(888) 4-NYSDOL / (888-469-7365)
TTY/TDD (800) 662-1220
www.labor.ny.gov

 **When you have finished answering these questions, <u>please turn to Page 8</u>.**

4

## BASIS OF DISCRIMINATION
*Please tell us why you were discriminated against by checking one or more of the boxes below.*

 You do not need to provide information for every type of discrimination on this list. Before you check a box, make sure you are checking it only if you believe it was a reason for the discrimination. Please look at the list on Page 1 for an explanation of each type of discrimination.

**Please note:** Some types of discrimination on this list do not apply to all of the regulated areas listed on Page 3. (For example, Conviction Record applies only to Employment and Credit complaints, and Familial Status is a basis only in Housing and Credit complaints). These exceptions are listed next to the types of discrimination below.

### I believe I was discriminated against because of my:

| | |
|---|---|
| ☐ **Age** (Does not apply to Public Accommodations) <br> Date of Birth: | ☐ **Genetic Predisposition** (Employment only) <br> Please specify: |
| ☐ **Arrest Record** (Only for Employment, Licensing, and Credit) <br> Please specify: | ☐ **Marital Status** <br> Please specify: |
| ☐ **Conviction Record** (Employment and Credit only) <br> Please specify: | ☐ **Military Status:** <br> Please specify: |
| ☐ **Creed / Religion** Not sure if MQ <br> Please specify: religion played a role in my accommodation denial | ☐ **National Origin** Not sure if this <br> Please specify: played a role in my denial. MQ |
| ☒ **Disability** My reasonable <br> Please specify: accommodation request was denied. I am suffering from an illness | ☐ **Race/Color or Ethnicity** Not sure if <br> race played a role in my accommodation denial MQ |
| ☐ **Domestic Violence Victim Status:** <br> (Employment only) <br> Please specify: | ☐ **Sex** <br> Please specify: ☐ Female  ☐ Male <br>    ☐ **Pregnancy** <br>    ☐ **Sexual Harassment** |
| ☐ **Familial Status** (Housing and Credit only) <br> Please specify: | ☐ **Sexual Orientation** <br> Please specify: |
| ☐ **Retaliation** (if you filed a discrimination case before, or helped someone else with a discrimination case, or reported discrimination due to race, sex, or any other category listed above) <br><br> Please specify: | |

**STOP** Before you turn to the next page, please check this list to make sure that you provided information **only** for the type of discrimination that relates to your complaint.

# EMPLOYMENT DISCRIMINATION

*Please answer the questions on this page only if you were discriminated against in the area of employment. If not, turn to the next page.*

**How many employees does this company have?**
a) 1-3        b) 4-14        c) 15 or more        (d) 20 or more)        e) Don't know

**Are you currently working for the company?**

☑ Yes

Date of hire: _April___ _17__ _2008_,        What is your job title? _Labor Services Rep._
          Month    day    year

☐ No

Last day of work: (_____ _____ _____)        What was your job title? _____
             Month    day    year

☐ I was not hired by the company

Date of application: (_____ _____ _____)
             Month    day    year

## ACTS OF DISCRIMINATION

**What did the person/company you are complaining against do? Please check all that apply.**

☐ Refused to hire me

☐ Fired me / laid me off

☐ Did not call me back after a lay-off

☐ Demoted me

☐ Suspended me

☐ Sexually harassed me

☐ Harassed or intimidated me (other than sexual harassment)

☐ Denied me training

☐ Denied me a promotion or pay raise

☐ Denied me leave time or other benefits

☐ Paid me a lower salary than other workers in my same title

☒ Gave me different or worse job duties than other workers in my same title

☒ Denied me an accommodation for my disability

☐ Denied me an accommodation for my religious practices

☒ Gave me a disciplinary notice or negative performance evaluation    Threatened to do this.

☐ Other: _____

6

# HOUSING DISCRIMINATION

*Please answer the questions on this page only if you were discriminated against in the area of housing. If not, turn to the next page.*

## Who discriminated against you?

☐ Builder          ☐ Bank or other lender      ☐ Manager / Superintendent

☐ Owner / Landlord    ☐ Salesperson           ☐ Other: _____

☐ Co-op Board        ☐ Condo Association

## What kind of property was involved?

☐ Single-family house      ☐ Mobile home      ☐ Building with 2-4 apartments

☐ Two-family house        ☐ Commercial Space  ☐ Building with 5 or more apartments

☐ Other: _____

## Does the owner live on the property?  ☐ Yes  ☐ No

## Was this property being sold or being rented?

☐ Being sold  ☐ Being rented

## Address of property:

Address: _____    Apt or Floor #: _____

City: _____    State: _____    Zip: _____

## Are you currently living there?

☐ Yes         ☐ No

## *ACTS OF DISCRIMINATION*

**What did the person you are complaining against do? Please check all that apply.**

☐ Refused to rent or sell to me

☐ Evicted me / threatened to evict me

☐ Denied me access for my disability

☐ Denied me equal terms, privileges, or facilities that other tenants were given

☐ Discriminated against me in lending or financing

☐ Advertised in a discriminatory way

☐ Harassed me based on my sex, national origin, race, disability, etc.

☐ Other: _____

**DESCRIPTION OF DISCRIMINATION -** for <u>all complaints</u> (Public Accommodation, Employment, Education, Housing, and all other regulated areas listed on Page 3)

**Please tell us more about each act of discrimination that you experienced. Please include dates, names of people involved, and explain why you think it was discriminatory. PLEASE TYPE OR PRINT CLEARLY.**

SEE Attached Explanations

This word-processed narrative submission is 17 pages in length.

(A) Discrimination Description (p.8) : Answered in 11 pages

(B) Question from Page 12 — How exactly did you Complaint about the discrimination : Answered on P. 12

(C) Question from Page 13 of this complaint form — People treated better than you were : Answered on pp. 13-17

If you need more space to write, please continue writing on a separate sheet of paper and attach it to the complaint form. **PLEASE DO NOT WRITE ON THE BACK OF THIS FORM.**

8

## NOTARIZATION OF THE COMPLAINT

Based on the information contained in this form, I charge the above-named Respondent with an unlawful discriminatory practice, in violation of the New York State Human Rights Law.

By filing this complaint, I understand that I am also filing my employment complaint with the United States Equal Employment Opportunity Commission under the Americans With Disabilities Act (covers disability related to employment), Title VII of the Civil Rights Act of 1964, as amended (covers race, color, religion, national origin, sex relating to employment), and/or the Age Discrimination in Employment Act, as amended (covers ages 40 years of age or older in employment), or filing my housing/credit complaint with HUD under Title VIII of the Federal Fair Housing Act, as amended (covers acts of discrimination in housing),as applicable. This complaint will protect your rights under Federal Law.

I hereby authorize the New York State Division of Human Rights to accept this complaint on behalf of the U.S. Equal Employment Opportunity Commission, subject to the statutory limitations contained in the aforementioned law and/or to accept this complaint on behalf of the U.S. Department of Housing and Urban Development for review and additional filing by them, subject to the statutory limitations contained the in aforementioned law.

I have not filed any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

I swear under penalty of perjury that I am the complainant herein; that I have read (or have had read to me) the foregoing complaint and know the contents of this complaint; and that the foregoing is true and correct, based on my current knowledge, information, and belief.

*Mohammed Quadir*

Sign your full legal name

Subscribed and sworn before me
This 10th day of May , 2012

Signature of Notary Public

County: Bronx          Commission expires:

JONATHAN PETER STEAD
Notary Public, State of New York
Qualified in Bronx Co No. 02ST6227906
Commission Expires September 7, 2014

**Please note: Once this form is notarized and returned to the Division, it becomes a legal document and an official complaint with the Division of Human rights. After the Division accepts your complaint, this form will be sent to the company or person(s) whom you are accusing of discrimination.**

# NYS Division of Human Rights Offices

*If you wish to contact the Division, please contact the office closest to you.*

**Headquarters:**
NYS Division of Human Rights
One Fordham Plaza, 4th Floor
**Bronx, NY 10458**

**Albany**
NYS Division of Human Rights
Corning Tower , 28th Floor
Empire State Plaza, P.O. Box 2049
Albany, New York 12220
Telephone No. (518) 474-2705

**Binghamton**
NYS Division of Human Rights
44 Hawley Street, Room 603
Binghamton, New York 13901
Telephone No. (607) 721-8467

**Brooklyn**
NYS Division of Human Rights
55 Hanson Place, Room 304
Brooklyn, New York 11217
Telephone No. (718) 722-2856

**Buffalo**
NYS Division of Human Rights
The Walter J. Mahoney State Office Bldg.
65 Court Street, Suite 506
Buffalo, New York 14202
Telephone No. (716) 847-7632

**Long Island** (Nassau)
NYS Division of Human Rights
175 Fulton Avenue, Suite 404
Hempstead, New York 11550
Telephone No. (516) 538-1360

**Long Island** (Suffolk)
NYS Division of Human Rights
New York State Office Building
250 Veterans Memorial Highway, Suite 2B-49
Hauppauge, New York 11788
Telephone No. (631) 952-6434

**Manhattan (Lower)**
NYS Division of Human Rights
55 Hanson Place, Room 1084
Brooklyn, New York 11217
Telephone No. (718) 722-2385

**Manhattan (Upper)**
NYS Division of Human Rights
Adam Clayton Powell State Office Building
163 West 125th Street, 4th Floor
New York, New York 10027
Telephone No. (212) 961-8650

**Peekskill**
NYS Division of Human Rights
8 John Walsh Blvd., Suite 204
Peekskill, New York 10566
Telephone No. (914) 788-8050

**Rochester**
NYS Division of Human Rights
One Monroe Square
259 Monroe Avenue, Suite 308
Rochester, New York 14607
Telephone No. (585) 238-8250

**Syracuse**
NYS Division of Human Rights
333 E. Washington Street, Room 543
Syracuse, New York 13202
Telephone No. (315) 428-4633

**Office of Sexual Harassment Issues**
NYS Division of Human Rights
55 Hanson Place, Room 900
Brooklyn, New York 11217
Telephone No. (718) 722-2060

**ADDITIONAL INFORMATION**

The next three pages are for the Division's records and **will not be sent out** with the rest of your complaint.

### Contact information

My primary telephone number:

6 4 6   3 2 7   3 6 6 7
(area code)

↗ Please use this Phone to contact me

X home phone
___ work phone
X cell phone
___ other _____

My secondary telephone number:

7 1 8   9 6 0   7 9 2 6
(area code)

___ home phone
X work phone
___ cell phone
___ other: _____

My email address: _____

Last four digits of my Social Security number: _8 5 2 3_

Contact person (someone who does not live with you but will know how to contact you if the Division cannot reach you):

Name: Kashmiri Quadir

Telephone number: 7 1 8   3 7 9   0 1 3 6
(area code)

Relationship to me: Mother

### Special Needs

I am in need of: a) A translator (if so, which language?): _____

b) Accommodations for a disability: A chair to sit on

c) Other:

3) Revocation of all disciplinary actions/letters relating to this matter.
4) In the interest of a negotiated settlement $3,500 for pain & suffering - for constantly having to write letters to the union & employer defending myself in my sick condition.

### Settlement / Conciliation:

To settle this complaint, I would accept: (Please explain what you want to happen as a result of this complaint. Do you want a letter of apology, your job back, lost wages, an end to the harassment, etc?)

1) To be exempt from prolonged standing work or any other duty requiring considerable physical exertion. This would include but is not necessarily limited to teaching workshops (sitting or standing and with or without use of a lectern). ② To have future accommodation requests [11]         approved based on medical

**Witnesses:**

**The following people saw or heard the discrimination and can act as witnesses:**

Name: _____  Job title: _____

Telephone number: _____  _____  _____

Relationship to me: _____

What did this person witness?: _____

Name: _____  Job title: _____

Telephone number: _____  _____  _____

Relationship to me: _____

What did this person witness? _____

*If you have more witnesses, please write their names and information on a separate sheet of paper and attach it to this form. Please do not write on the back of this form.*

**Additional Details:**

**Did you report or complain about the discrimination to someone else?**
*(If you told someone, filed a report or sent a letter about the discrimination, please indicate whether you went to a supervisor, a manager, the owner of the company, your human resources office, your union, your housing provider, the police, etc.).*

I reported/complained about the discrimination to my Union, which is the NYS Public Employees Federation.

**Date you reported or complained about discrimination:** RA denial fax sent on Feb. **23** '**12**, Thursday
month / day / year

**How exactly did you complaint about the discrimination?**
*(Who did you talk to about it? Who did you filed a report or make a formal written complaint or union grievance with? What did you say?)*

SEE Attached Explanation

→ My supervisor, Ms. Ramos, sent me an email on Feb. 27, '12, Mon.

**What happened after you complained?** threatening to charge me with insubord-
*(Was your complaint investigated? Was any action taken in response to your complaint? Did the* nation
*discrimination stop? Did you experience retaliation for complaining?)*

The Union has tentatively agreed to represent me in any disciplinary action against me due to my inability to teach workshops (whether they be sitting or standing or with or without the use of a lectern). It is likely that the

12

If you did not report the discrimination, please explain why:

NA

Did the person you are complaining against touch you, hurt you, or physically harm you?

☐ Yes   ☒ No

*If yes, please explain:*

Examples of other people who were discriminated against in the same way as you were:
*(For example, people who were harassed by the same manager, disciplined or terminated for the same reasons, did not receive an accommodation for the same reasons, etc.).*
*If you are complaining about discrimination relating to race, national origin, age, religion, etc. please describe their races, national origins, ages, religions, etc.*

Not absolutely sure if this section applies.

Examples of other people who were treated better than you were:
*(For example, people who were not fired for doing the same thing you were fired for, people who were doing the same job but making more money, people who were allowed to stay in the store while you were told to leave, etc.).*
*If you are complaining about discrimination relating to race, national origin, age, religion, etc. please describe their races, national origins, ages, religions, etc.*

SEE Attached Explanation

13

Read First
May 18, '12 DHR
Complaint
Doc # 2 of 3

...sion of Human Rights Complaint, Form Last revised on 11/21/10

MAY 18 2012

Mohammed Quadir

**Question from Page 8 _(Answered in Eleven Pages—Out of 17 Pages—Below):_**

## Description of Discrimination:

Sometime in late November and early December of 2010, I first began noticing the symptoms associated with my disabling condition/illness, which was later diagnosed as Major Depressive Disorder (MDD). Initially, for the first few weeks, I was hoping the symptoms that I was experiencing would go away, but they didn't. The symptoms included: (A) Fatigue, (B) Headaches, (C) Difficulty Concentrating, (D) Lightheadedness/Balance Problem, and (E) Dry/Tired Sleepy Eyes.

I first started seeking medical attention for my symptoms sometime around late December '10 and early January '11. Initially, I was chiefly being seen by two physicians one of whom was a cardiologist and the other a primary care physician (PCP). The cardiologist first wrote me a medical note, dated 1-28-11, to show my employer, which is the NYS Labor Dept. (DOL). The note requested that I be excused from 'public speaking' as I am undergoing medical tests until 2-13-11. Based on the troubling findings of one of the medical tests, the PCP wrote me another note for my employer, which was dated 2-11-11. This note requested that I be excused from prolonged standing work duties, for at least two months, as I was undergoing further workup for chronic lightheadedness. At this point, neither doctor had officially diagnosed me with a disease even though they were giving me medication to try to control my adverse symptoms. They were referring me to specialists for further treatment and examination. Based on these two medical notes, my immediate supervisor at that time Ms. Cynthia Meggett (Supervising Labor Services Representative—SLSR), informally exempted me from prolonged standing work duties, which included teaching workshops, or any other activity requiring considerable physical exertion. I did not, at that time, have to formally file a reasonable accommodation (RA) request with the Labor Dept.'s Division of Equal Opportunity Development (DEOD) office, which is the agency's equal opportunity (EO) office.

1

**In April '11 however, I had to formally file a reasonable accommodation request with DEOD as** the supervisors in my office including Ms. Meggett (immediate supervisor—now retired) and Mr. Arthur Merlino (Bronx DOL Office Manager—now also retired) were refusing to extend my reasonable accommodation based on another medical note written by my neurologist dated 4-1-11. That note indicated that I should be excused "from prolonged standing work responsibilities due to medical issues." **That note did not officially diagnose me with a specific illness as I had not been** diagnosed with MDD yet; that diagnosis would come months later. This note was open-ended in that it did not specify a time after which I could resume all conceivable Labor Services Representative-related (LSR-related) duties.

I mailed the DOL's Reasonable Accommodation Request Form (GA 142—10-08) along with my doctor's note sometime in April '11, which DEOD received on April 27, '11. (My April '11 Accommodation Request contained a 4-page narrative in which I explained in detail the accommodation I was requesting, which was for at least 4 months, and the symptoms I experienced every single day. It **also detailed the unfair and unequal distribution of workshops and assignments in** the Bronx DOL Office and how I had been mistreated and taken advantage of as a worker by the management—please see subsequent sections for a further explanation of this.)

DEOD wrote me a Request for Additional Information letter on May 13, '11 in response to my April '11 Accommodation Request. DEOD informed me in its letter that my 4-1-11 medical note did not identify my medical condition; and also that **additional medical documentation from my doctor was required identifying my illness and the specific limitations that it placed upon me in doing my job.** Sometime in May '11, I spoke to Mr. Joseph Kabance, the DEOD Affirmative Action Administrator 3 assigned to my case. I informed him that I could try to get my doctor to write me a more detailed note indicating the symptoms I was experiencing, but that at this point it was not possible for me to obtain a note that specifically diagnosed me with a particular disease as no such diagnosis had been made yet. That is why I was undergoing all these tests and examinations to determine what was causing all these symptoms.

In order **to comply with DEOD's instruction, I had to take a day off from work on Friday, May 27, '11,** to visit my neurologist seven weeks earlier than my next appt. in mid July '11. I also had to **pay a $20 co-payment.** The sole purpose of this visit was to request another more detailed medical note, which the doctor wrote for me. In that May 27th note, the doctor did not specifically diagnose me with a particular illness; instead he listed some of the symptoms (such as headaches, difficulty concentrating, and vertigo) for which I was being treated. He requested I be exempt from prolonged standing work for the next three months—meaning until August 27, '11.

I sent this May 27th medical note to DEOD shortly thereafter. On **July 25, '11, I also emailed to DEOD including Mr. Kabance (Affirmative Action Administrator 3) a 2-page letter explaining in detail why in my present condition I am also unable to teach workshops sitting down** (See Subsequent Pages of this 'Description of Discrimination—Question from Page 8' Section of the NYS Human Rights Division Complaint—for an Exact Pasted Copy of that July 25, '11 letter and some Additional Info.) It was the position of my previous supervisor, Ms. Meggett, that I should be forced to teach workshops sitting down if I can't teach them standing up even though I am ill. Either partly or substantially as a result of this July 25th letter, DEOD sent me a response, officially dated July 20, '11, approving my reasonable accommodation request until August 27, '11. The letter indicated that at the end of the accommodation period, I was to resume my "regular work schedule pending any new medical information submitted or new request for reasonable accommodation." On August 23, '11, DEOD also approved a 4-month extension of my accommodation until December 29, '11, based on another medical note medical note dated 8-15-11. This medical note written by my neurologist also did not provide a specific diagnosis, but similar to the previous May 27th note only indicated many of the symptoms for which I was being treated; it also noted that I was now being seen by a psychiatrist in addition to a neurologist.

The chief basis of this complaint now being filed really started when **DEOD denied on February 14, '12, an extension of my reasonable accommodation request,** which was based on my December 12, '11, medical note written by my psychiatrist (See Attachment # 1 for Medical Note). Ironically, this note was the most detailed of all the previous doctors' notes submitted. This note specifically **diagnosed me with Major Depressive Disorder (MDD), which is a disabling condition.** This note requested that I be excused for at least 4 months from prolonged standing work assignments or any other activity requiring considerable physical exertion due to my medical diagnosis. The note also iterated the symptoms for which I was continuing to receive treatment.

DEOD's February '12 denial of my reasonable accommodation request is based on at least **3 false premises** (See Attachment # 2 for DEOD's Denial Letter). **First,** DEOD claimed in its Feb. '12

denial letter that teaching workshops is an **essential function** of my job title as a Labor Services Representative (LSR). It certainly is not—see section below (7 Reasons Why Teaching Workshops Is Not an Essential Function of a LSR's Job Title section) for a detailed explanation as to why I believe teaching workshops is not an essential function of the LSR job title. (The term workshop is being defined here as teaching something before an audience for let's say at least 30 minutes.)

**Second**, DEOD claimed in its denial letter that because of **the need to provide workshops** by LSRs and the **workload at the Bronx DOL office**, it was no longer reasonable to extend my accommodation any further—my RA request was denied after being initially being approved for nearly one year even though my illness persists. Due to declining customer demand for workshops most of the LSRs in this Bronx office either **do not teach workshops at all (about 6 LSRs or 33%)** and have not done so during the last four years I have been in this Bronx DOL office or only teach a workshop once every 28 days or **4 weeks (about 8 LSRs or 44%)**—not really even that these days due to declining customer demand for workshops. **(I taught workshops here for 2 years and 4 months**, which is explained in detail on subsequent pages.) Out of 18 Labor Services Representatives (LSRs) in this Bronx Office only 2-3 at most actually do the yeoman's work of teaching workshops in this office. The **declining demand for workshops** and as a result the reduction of them being offered was even acknowledged via email on August 3, '11, by my current supervisor Ms. Noemi Ramos (See Attachment # 3). In that email she advises LSRs "the Interviewing Skills Workshop will only be given once a week on Thursdays. This is due to the low volume of customers." (Please also refer to the Question from Page 13 of the NYS Human Rights Division Complaint Form. In fives pages, I answer in detail the following question: "Examples of other people who were treated better than you were.")

**Third**, DEOD offered to provide me with a **high chair and a lectern** as a reasonable accommodation [3] in lieu of exempting me from certain marginal duties of the LSR job title such as teaching workshops. However, offering someone with my illness and symptoms a chair and a lectern is really a meaningless accommodation. On **July 25, '11, I emailed to DEOD including Mr. Kabance** (Affirmative Action Administrator 3) **a 2-page letter explaining in detail why in my present condition** I am also unable to teach workshops sitting down. (See Subsequent Pages of this 'Description of Discrimination—Question from Page 8' Section—for an Exact Pasted Copy of that July 25, '11 letter and some Additional Info.) Either partially or substantially **as a result of this July 25th letter, DEOD approved my earlier accommodation requests—at least 2 of them—during 2011.** However, my illness has not abated and as a result I am still unable to do now (i.e., teach workshops, etc.) what I was unable to do in July '11. DEOD appeared to have had accepted my reasoning and explanation in July '11, as to why I would find it enormously difficult to teach workshops sitting down; but now in Feb. '12, they seemed to have changed their mind and now very evidently believe I can indeed teach workshops sitting down. DEOD's denial of my accommodation request does not mean my health has suddenly and miraculously improved overnight.

**Mr. Kabance (Affirmative Action Administrator 3) was also unprofessional in how he handled my case.** Here is an example of his unprofessionalism: On December 20, '11, I faxed Mr. Kabance my December 12, '11, medical note written by one of my physicians diagnosing me with Major Depressive Disorder, which is a disabling condition. The note also indicated the symptoms for which I was being treated and requested that I be excused for al least 4 months "from prolonged standing work duties or any activity requiring considerable physical exertion due to his medical diagnosis." (See Attachment # 1) Mr. Kabance wrote me an email on December 21, '11, to acknowledge receipt of this fax. Mr. Kabance's exact words from his December 21 email were: "Mohammad [sic],

I received your faxed request and medical for an extension of your current r/a. I am assessing it at this time and will complete the assessment upon my return from annual leave on Dec 30th.""

On January 26, '12, I was quite shocked and disappointed to learn that under Mr. Kabance's stewardship my reasonable accommodation request had been allowed to expire on December 29, '11. Mr. Kabance in fact called and emailed me on January 26, '11, to advise me of this—**over 36 days after he had received my faxed medical note on December 20th**. He also requested that I submit yet another DOL DEOD RA Form (GA 142 form) even though a very detailed form was already submitted to DEOD in April '11. In response to his latest request, **I wrote Mr. Kabance an email on January 27, '12, to inform that even though I would comply with his instruction to submit another Form GA 142, I thought requirement itself to do so was unfair and unreasonable for at least a couple of reasons.**

**First,** Mr. Kabance broke his pledge to complete assessment of my RA request on December 30, '11, upon his return from annual leave. (The chief reason he gave me on the phone on January 26, '12, was that he was considering the RA cases of other DOL employees during most of January '12 even though he had in his possession my faxed medical note since December 20th '11.) If Mr. Kabance needed an extension after December 30th to continue working on my RA case he should have called me very shortly thereafter and not allowed my RA to expire on December 29th. This is called common courtesy. He should not have waited until close to a month and a half—until January 26— to inform me that my RA had expired on December 29, '11, because he was working on the RA cases of other employees.

The **second reason** asking me to submit another Form GA 142 was unfair and unreasonable in my view was that my illness/medical condition is an ongoing issue; it is not a new case or illness. Yet Mr.[4] Kabance wanted me to submit yet another Form GA 142 when such a detailed form/application was already submitted to DEOD in April 2011. The issues since April '11 had not really changed; they were and are all still essentially the same. The only real difference is this December '11 medical note gives an actual diagnosis of Major Depressive Disorder, which is causing me to experience all these adverse symptoms. (Previous medical notes did not diagnose my condition. They only listed the symptoms for which I was being treated.) I explained I should not have to repeatedly write three-to-four page essays for DEOD, in my sick condition, answering the same exact questions/issues that were already explained and answered—such as why I am unable to teach workshops sitting down.

In the end however, I did not have to submit another DOL RA Form GA 142. This is due to Public Employees Federation (PEF) **union intervention**. Mr. Barry Markman, PEF Field Union Representative, contacted Mr. Kabance on my behalf. And from what I understand he told Mr. Kabance that he would personally bring my case to the **DOL Commissioner's attention** if I was not given a temporary extension of my reasonable accommodation. This would give me time to comply with DEOD's latest request to complete another DOL RA Form GA 142 and would exempt me from having to teach workshops in the intervening time. (Mr. Kabance allowed my reasonable accommodation to expire on December 29th even though he emailed earlier that he would complete his assessment of my request on December 30, '11.) As a result of union intervention, Mr. Kabance emailed me on Monday, January 30, 2012 to advise that he had reconsidered his earlier request for my accommodation request to be put on the GA 142 form and treated like a new request. He also informed that he would continue processing my RA request as an extension of my current accommodation.

Mr. Kabance broke his commitment/pledge to complete assessment of my RA request on December 30, '11. He did not do what he said he would do. This is very disappointing when you consider that Mr. Kabance is a senior level supervisor within the Labor Dept. with a salary grade of at least 25 making very close to a $100k salary. I would never treat one of my unemployed customers that I provide services to in the careless, sloppy, and unprofessional manner that Mr. Kabance handled my case. (Copies of all these emails can be provided as proof to the Human Rights Division if the veracity of these assertions is disputed by the Labor Dept.)

It took me 3 months to write this 17-page narrative explaining and detailing this complaint. Had I been healthy I would have been able to submit this complaint much earlier. Just having to go through this process is causing me added stress and hardship. When reviewing this complaint please keep in mind that **at least 77% (14/18 LSRs) of the LSRs in this Bronx office have been treated substantially or somewhat better than me insofar as teaching workshops is concerned.** And DEOD never really answered my question as to whether those 6 LSRs have been granted a permanent lifetime exemption from having to teach workshops. **(Please also refer to the Question from Page 13 of the NYS Human Rights Division Complaint Form. In fives pages, I answer in detail the following question: "Examples of other people who were treated better than you were.")**

My accommodation request was denied even though I have a medically documented record of illness, while others have been informally exempted from having to teach workshops for many years now. Thank you for your assistance regarding this matter. My health and my livelihood depend on it. (Please see below for a discussion of Why Teaching Workshops Is Not An Essential Function of A LSR's Job Title, Issues Deliberately Ignored by DOL DEOD, my July 25, '11 letter to DEOD—workshops sitting down—, and answers to the questions from page 12—How exactly did you complaint about the discrimination?—and page 13—Examples of other people who were treated better than you were—from the Division of Human Rights Complaint Form. Pages numbers are indicated on the middle right-hand side of every page; this is page 5 of 17.)

5

## 7 Reasons Why Teaching Workshops Is Not An Essential Function of A LSR's Job Title

**(1) Unequal and Uneven Distribution of Workshops and Assignments in This Bronx Office**: Due to declining customer demand for workshops most of the LSRs in this Bronx office either do not teach workshops at all (about 6 LSRs—or 33%) and have not done so during the last four years I have been in this Bronx DOL office or only teach a workshop once every 28 days or 4 weeks (about 8 LSRs—or 44%)—not really even that these days due to declining customer demand for workshops. Out of 18 Labor Services Representatives (LSRs) in this Bronx Office only 2-3 at most actually do the yeoman's work of teaching workshops in this office. The declining demand for workshops and as a result the reduction of them even being offered was acknowledged via email on August 3, '11, by my current supervisor Ms. Noemi Ramos (See Attachment # 3). In that email she advises LSRs "the Interviewing Skills Workshop will only be given once a week on Thursdays. This is due to the low volume of customers." (Please also refer to the Question from Page 13 of the NYS Human Rights

Division Complaint Form. In fives pages, I answer in detail the following question: "Examples of other people who were treated better than you were.")

**(2) LSRs Assigned to Many Other DOL Units (599, TCC-UI, UIAB) Don't Teach Workshops:**
To the very best of my knowledge, LSRs assigned to the following three DOL units do not teach workshops: 599 unit in Albany, Telephone Claims Center Unemployment Insurance (TCC-UI), and the Unemployment Insurance Appeal Board (UIAB). Whether or not a LSR is even asked to teach workshops (of any kind in any setting) depends chiefly on what kind of a unit s/he has been assigned.

The 599 unit chiefly processes 599 training applications for those claimants seeking only to enroll in training or college without being required to look for work as a condition of receiving unemployment insurance (UI) benefits. If approved claimants are exempt from having to look for work as a condition of collecting UI benefits. The TCC-UI processes UI claims for benefits to determine claimants' eligibility. As an example, TCC-UI determines if a worker lost his/her previous job due to misconduct; if misconduct is determined then TCC-UI denies the UI claim for monetary benefits. The LSRs in these two units process applications and conduct phone interviews—as opposed to desk interviews, which is what I do—to determine eligibility; they however as a general rule do not teach workshops to customers. Additionally, LSRs assigned to the Unemployment Insurance Appeal Board (UIAB) very likely also do not teach any workshops. (On February 28, '12, I spoke to a worker from the 599 unit Albany. This worker, whose name I do not recall, confirmed that LSRs in the 599 unit do not teach workshops. They instead interview customers over the phone regarding their applications and field general 599 phone inquiries.)

**(3) Conducting Interviews (In Person or Over the Phone) Is However an Essential Function of a LSR's Job Title:** Every single (all 18) LSR in this Bronx DOL office conducts desk interviews. [6] Even the two LSRs, Daniel Garcia and Gregoria Martinez, who seem to have been permanently assigned to manage the computer/resource room on the first floor, even they conduct desk interviews. Besides assigning computers to unemployed customers for job search purposes, they also make copies and fax resumes to employers on behalf of customers, etc. (Incidentally, LSRs Garcia and Martinez have not taught a workshop since the 4 years I have been at this Bronx office; they however are professionals whom I respect.) Even the LSRS assigned to the 599, TCC-UI, and UIAB units conduct interviews albeit chiefly over the phone—please see immediately above. They however generally do not teach workshops.

Although I am not absolutely sure about this, it could also possibly be the case that other LSRs assigned to the Division of Employment and Workforces Solutions (DEWS) in other offices may not have to teach workshops at all. (I work in the DEWS division.) For example, it could be the case that LSRs in the White Plains or Yonkers DOL DEWS offices don't have to teach workshops. The workshops there may be taught by the employees of contracted not-for-profit agencies hired via federal or local government funding. In my Bronx office, we also have not-for-profit workers—hired by the City of New York—who work alongside DOL workers. However, DOL LSRs in the Bronx teach their own workshops; the work is not farmed out to another private agency, which may possibly be the case in the Yonkers or White Plains DOL offices.

Incidentally, when I first started working at Bronx DOL in April '08, only one LSR—to the best of my recollection—named Frank Cook taught workshops; he taught the resume workshop, which was the only workshop available to teach at around that time. All the new workshops that were recently created—sometime during and after the middle of 2010—such as the Job Search Techniques

Workshop and Interviewing Techniques Workshop did not exist back then. LSR Cook along with LSRs Frank DeLorenzo and Bernadette Layton were also assigned to review and fax customers' completed 599 training applications to the DOL's 599 unit in Albany for final processing. This was their specialized task. Overtime, every LSR in this Bronx office was trained to review and fax 599 applications to Albany.

**(4) Essential Function Only For Me but Not Others:** If teaching workshops is such an essential function of a LSR's job title—as DEOD claims in its Feb. 14, '12 denial letter—, then why are so few LSRs in practice actually doing so? Or is the agency (DOL) claiming that teaching workshops is only an essential function for me but not for others? There are about 6 LSRs (33%) here who have never taught a workshop since the four years I have been working at this office—i.e., since April '08. (Please also see on subsequent pages the 'Question from Page 13: Examples of other people who were treated better than you were.')

**(5) DOL's Exam Announcement Emphasizes Customer Interviews and Eliciting Information not Teaching Workshops (see Attachment # 4):** Attachment 4 is the original October 13, '07, LSR exam announcement posted by the NYS Dept. of Civil Service. I got hired in April '08 as a result of my grade on this exam. If you look at the duties section of this Oct. 13, '07, exam announcement you will notice that conducting interviews and eliciting information is indicated as a major duty of the LSR job title; however teaching workshops is not mentioned anywhere in the job duties section—see Attachment 4.

Furthermore, my job title is Labor Services Representative (LSR); my job title is not "Vocational Instructor 4," "Agency Training & Development Specialist," or "Teacher 4." If my job were any of the aforesaid three titles just mentioned then perhaps DOL could argue that teaching is an essential function of my job. However, my job title is LSR not for example "Teacher 4" and while teaching maybe a function for LSRs in certain units (not in the 599, TCC-UI, UIAB units as noted previously), it is certainly not an Essential Function. Teaching is not the main reason the LSR job title was created; conducting interviews (whether in person or over the phone) to elicit information from unemployed customers is. Depending on what kind of a unit a LSR is assigned to, teaching workshops at best is a marginal function of the LSR job title. (Also as discussed previously, about 6 LSRs—or 33%—have not taught a workshop in this Bronx DOL office since the four years I have been working here.)

**(6) Employment Interviewer (not teacher or instructor) is my informal/unofficial job title:** This is how my job title is inscribed on some of my business cards printed by the Department. And this is also how the job titles of all the LSRs working in the Bronx DOL office are described in the official Bronx DOL phone directory. (Copies of my business cards and Bronx DOL phone directory can be submitted on request.)

**(7) DOL Assigns Employees to Out-of-Title Work Whenever It Suits Its Interest:** Consider the following two examples. First, consider the example of Mr. Makie Sanchez whose official job title with the Labor Dept. is Supervising Labor Services Representative (SLSR). The main responsibility of a SLSR is to supervise the work of LSRs--such as myself--at a specific office. However, from what I understand, Mr. Sanchez does not in reality perform his actual duties as a SLSR. Instead, for at least the last 10-15 years he has been working for the agency as an information technology (IT) specialist. Instead of supervising LSRs at a particular office, he travels the five boroughs of NYC and troubleshoots and repairs the computers of DOL staff, in person and also over the phone, as needed.

7

He was hired by the State of NY to be a SLSR not an IT specialist. However, he mainly performs the duties associated with an IT specialist not a SLSR.

Second, I was also assigned work out of my job title when I was assigned to teach the Veterans 8-Week Follow-up Workshop in October '10, by the previous Office Manager—now retired—Mr. Arthur Merlino. I was assigned to teach this class **(work out of my job title)** even though I am a Labor Services Representative not a Veteran Services Representative. We have a Veteran Services Representative in this Bronx DOL office named Mr. Juan Serrano. It would seem more fitting for a Mr. Serrano—Veteran Services Rep.—who has been trained specifically in veterans' issues to teach the workshop relating to veterans. However, Mr. Merlino (previous office manager) assigned me to teach the Veterans 8-Week Follow-up Workshop—in Mr. Serrano's stead—chiefly because he could not get along with Mr. Serrano. He was constantly arguing and trying to discipline Mr. Serrano. The office manager, it was very obvious, did not like and could not get along with Mr. Serrano. I taught this workshop until about the end of January '11 (for about 4 months), when I had to be removed from teaching workshops due to my illness which appeared to be steadily getting worse at that time-- 1st medical note given to DOL requesting accommodation dated 1-28-11. (Please also refer to the Question from Page 13 of the NYS Human Rights Division Complaint Form. In fives pages, I answer in detail the following question: "Examples of other people who were treated better than you were.")

## Six Issues Deliberately Ignored by DOL DEOD

8

**(I) The Agency Never Considered Assigning Me to Another Office or Related Job Title:** If teaching workshops is truly an essential function of a LSR's job title (which it certainly is not), why did DEOD not consider assigning me to another office or another related job title where I may not be required to teach workshops at least for now? In fact, in denial letter dated Feb. 14, '12, DEOD indicated "that a transfer request is not a reasonable accommodation under the Americans with Disabilities Act of 1990." (See Attachment # 2.)

**(II) Teaching workshops Is Not the Same Thing as Selling MetroCards:** Teaching workshops—to 5 to 60 unemployed customers when many of them are upset at being forced to appear at DOL as a condition of collecting UI benefits—is not the same thing, for example, as sitting down inside a secure booth and quietly selling NYC subway MetroCards to riders. (Please see my July 25, '11, letter—pasted below—to DEOD's Mr. Kabance, which explains why I am unable to teach workshops sitting down.)

**(III) DEOD Never Answered How Many LSRs Have been Granted Exemption from Workshop Teaching Duties in This Bronx Office:** Despite repeated requests, Mr. Kabance never really answered my question as to how many LSRs have been granted a permanent lifetime exemption by DEOD from ever having to teach workshops in this Bronx DOL office. The closest Mr. Kabance came to answering my question was in a July 12, '11 email in which he wrote: "In answer to your statements about LSRs and workshop assignments in DEWS as outlined in your letters, DEOD is not

involved in the management of the DEWS operation and the day to day activities of scheduling or giving workshop assignments." (A copy of this email can be provided on request.) There are about 6 LSRs (33%) here who have never taught a workshop since the four years I have been working at this office—i.e., since April '08. (Please also see on subsequent pages the 'Question from Page 13: Examples of other people who were treated better than you were.')

**(IV) Venus Williams Diagnosed with Sjogren's Syndrome after 7 Years:** Tennis player and celebrity Venus Williams was diagnosed in August '11 with Sjogren's Syndrome. This condition causes her to suffer from fatigue, swollen joints, dry eyes, dry mouth and heavy limbs. This Syndrome, for which there is no cure, even forced her from competing in the US Open during the summer of '11. The diagnosis of Sjogren's Syndrome was made after nearly 7 years of being misdiagnosed with other conditions. For example, four years ago she was incorrectly diagnosed with exercise-induced asthma; however, the asthma medication prescribed never worked. Since there is no cure, the best that can be done for a patient is to be prescribed medication to try to control/manage the adverse symptoms.

Now I am mentioning all this because Ms. Williams (unlike me) is a famous celebrity with millions of dollars and can afford the best health care in the world. Nonetheless, it still took her doctors 7 years to properly diagnose her and even then they could not provide her with a cure. Unlike Ms. Williams, I cannot afford the best health care in the world and do not have unlimited resources. I cannot give an exact timeframe as to exactly when I will be able to rid myself of this illness—if ever. If Major Depressive Disorder (MDD) is all I have then in a way that is actually good news. People afflicted with MDD generally do get better over time. For some it might take months; for others it may take years. But most patients generally recover over time. But if my condition ends up being MDD and some yet-to-be-diagnosed medical condition for which there is no cure, then I may in fact be stuck with a lifetime disability from which there is no escape. The DEOD official assigned to my case, Mr. Kabance, I guess incorrectly assumed just because he denied my RA request that my illness would suddenly and miraculously get better overnight and that I would now be able to do (teach workshops) that I was not able to do before—even with a chair and lectern. Mr. Kabance was also advised during a phone conversation with me earlier this year about the situation with Ms. Venus Williams and Sjogren's Syndrome. He chose to ignore the information presented.

9

**(V) NYS DCS Approved My RA Request and NYS Judge Excused Me from Jury Duty:** DEOD also ignored the fact that a NYS Bronx Supreme Court Judge recently excused me from jury duty service as a result of my illness. The NYS Dept. of Civil Service also approved my RA request by granting me some extra time to take a recent promotion exam as a result of my illness. If these two distinct institutions of government can be rational and reasonable, then why can't my employer (i.e., NYS DOL)?

**(VI) DEOD Never Addressed the Following Three Issues:** Why I have Traditionally been Assigned to Teach the most Difficult of Workshops, i.e., 'Basic/Introductory Resume Workshop'? Why I was Tricked and Ambushed into Teaching the Advanced Resume Workshop on January 26, '11? Why I Was Assigned Work Out of My Job Title, i.e, being Assigned to Teach the Veteran's Workshop even though We Have a Veteran's Counselor Onsite? (For Additional info., please see on subsequent pages the 'Question from Page 13: Examples of other people who were treated better than you were.')

NYS Division of Human Rights Complaint, Form Last revised on 11/21/10
*Mohammed Quadir*

## Some Reasons Why I am Unable to Teach Workshops Sitting Down

Below is a letter that was emailed to Mr. Joseph Kabance from DEOD on July 25, '11, explaining why I am unable to teach workshops sitting down. **(Something else I don't think I mentioned in that letter below is that many of the DOL customers are only there because they are being forced to be there as a condition of collecting unemployment benefits. As a result, they take out their frustrations on us workers. This is significantly intensified in a group/workshop teaching setting where one disruptive/unruly customer can incite and encourage other customers to follow suit. In my present physical and mental condition, I am simply not capable of dealing with such disruptive and unruly behavior especially in a group setting of 5-60 people. Teaching workshops is not the same thing for example as sitting down inside a secure booth and quietly selling NYC subway tokens to riders.)** ------------------------------------------------------------------------------------

July 25, 2011


Mohammed Quadir
Labor Services Representative
Bronx, NY Dept. of Labor

10


Re: Workshops Sitting Down


Dear Mr. Kabance:


I am writing you this email in response to your question on Wednesday, July 13, '11, both via the phone and email inquiring why I am unable to teach workshops sitting down. As you know the 5 main symptoms I have been complaining of are Fatigue, Difficulty Concentrating, Lightheadedness/Balance Problem, Headaches, and Dry/Tired Sleepy Eyes.

Before my condition/illness, I used to generally speak in a loud and boisterous voice both when teaching workshops and conducting desk interviews. However, due to my condition these days I am no longer able to speak in a loud and authoritative/commanding manner due to my chronic and considerable **fatigue**. I am much more subdued and restrained when speaking not necessarily because I want to be, but because I don't have a choice but to be due to my chronic and considerable fatigue. **Due to my considerable fatigue, I no longer have the physical ability to project my voice in a sustained fashion and speak in a loud and authoritative manner, which would certainly be required when teaching workshops of any duration whether sitting or standing.**

Due to my **difficulty concentrating,** I also have difficulty processing auditory information especially when my symptoms are intense—meaning **difficulty comprehending what is being asked of me or being said to me. However, when conducting a desk interview with a customer one-to-one, it is much easier**

because I am only dealing with the needs of one person and one person only. I am focused solely on that person and what s/he is saying. However, when in a group setting with 30-to-50 plus individuals the task is exponentially more difficult especially for a person in my condition. The brain and body are being asked to work/perform so much harder. Additionally, my headaches (which is a source of pain) and my lightheadedness also make it harder for me to concentrate.

Please also understand the customer base we serve. We at this Bronx DEWS DOL Office serve the unemployed. These are mostly good people who have lost their jobs. As result, they (many) are frustrated. They are frustrated because they have no job, no money, no health insurance, they may be on verge of losing their home or their marriage and so forth. Often times, they take out their frustrations/problems on us (meaning both the clerical staff and the LSRs) by speaking to us in a very abusive manner. Now I could handle these additional pressures (and in fact did handle these pressures during the 2 years and 4 months I taught workshops here) when I was healthy. However, due to my current condition, this is something I am simply not able to do at the moment especially in a group/workshop teaching setting.

It is precisely because teaching workshops is a far more physically and mentally demanding task most of the Labor Services Representatives (LSRs) try to avoid or get out of teaching workshops. I taught workshops here for at least 2 years and 4 months when most of the other LSRs didn't. (There are about 6-8 LSRs in this office who do not teach any workshops and have not taught any workshops since the 3 years I have been here.) When I was teaching workshops during that period I didn't really realize how much harder (i.e., physically and mentally demanding) teaching workshops is compared to conducting desk interviews one-to-one. I didn't realize it because I was healthy and my body was healthy. Now that I am no longer healthy I realize how much physically and mentally harder it is for someone to be in front of an audience for any sustained length of time and teach them something in a loud and authoritative voice. It takes a lot more physical and mental effort to do. And as I told you during my phone conversation with you on Wednesday, July 13, '11, there was one time I taught the basic English resume class (not referring to the easier Advance Resume Workshop) for about 4 hours and 15 minutes. I started at 10am and didn't finish before 2:15pm. I only took a 3-4 minute break to use the bathroom and drink some water. I had that much stamina and energy. These days in my condition, I would be very lucky if I could teach something before an audience for 5 minutes. I no longer have anywhere near the level of energy and stamina I once used to have.

I hope this response answers your questions as to why I am unable to teach workshops sitting down. And as I told you on Wednesday, July 13, '11, I am ready to explore other ways (other than teaching workshops) I may serve DOL such as entering new employment statistics into the computer, as an alternative, when I am not interviewing customers at my desk. In fact, I suggested this idea earlier to my Supervisor, Ms. Cynthia Meggett. She however did not seriously consider my suggestion. Thank you.

M. Quadir


P.S.: This is not necessarily an exhaustive list of all the reasons why I am unable to teach workshops sitting down. And also I didn't address the other issue that it would be both impractical (i.e., not really workable/manageable) and unprofessional to teach workshops sitting down.

NYS Division of Human Rights Complaint, Form Last revised on 11/21/10
**For Division Records Only—Not to be Sent to Employer**
Mohammed Quadir

<u>Question from Page 12</u> *(Answered in One Page Below)*:

**How exactly did you complaint about the discrimination?**
*(Who did you talk to about it? Who did you filed a report or make a formal written complaint or union grievance with? What did you say?)*

I discussed the denial of my reasonable accommodation (RA) request with Mr. Barry Markman, Public Employees Federation (PEF) Field Representative, I believe on Thursday, Feb. 23, '12. (His phone no. is 718-637-2019.) At his request, I faxed him my RA denial letter issued by Division of Equal Opportunity Development (DEOD) that very evening. I also forwarded to him an email on Monday, Feb. 27, '12, from my immediate supervisor, Ms. Noemi Ramos, who in writing on Feb. 27, **threatened to charge me with insubordination** if I am unable to teach workshops "when the suitable equipment arrives" meaning an elevated chair and lectern. Copies of this email were also forwarded to Mr. Markman's supervisor, Mr. Marvin Moschel, and also to Ms. Dorothea Washington who is the PEF Division 245 Council Leader for the Labor Dept. **(Ms. Washington advised me via email on August 16, '11, there was nothing in the PEF contract that the Union could use to force DEOD to grant or extend my reasonable accommodation request.)**

In that Feb. 27, '12 email, I took the opportunity to remind Mr. Markman about the unfair and unequal distribution of workshops and assignments in this Bronx DOL office. I explained to him why I took strong exception to DEOD describing teaching workshops as an essential function of an LSR's job duties, because it certainly is not. As an example, **out of 18 Labor Services Representatives (LSRs) in this Bronx Office only 2-3 at most actually do the yeoman's work of teaching workshops in this office. The remaining LSRs either do not teach workshops at all and have not done so during the four years I have been in this Bronx DOL office or only teach a workshop once every 28 days or 4 weeks—not really even that these days due to declining customer demand for workshops.** Incidentally, when I was healthy I taught workshops here for 2 years and 4 months: two years teaching the resume workshop, <u>which is the most difficult workshop and 4 months teaching the veterans 8-week follow-up workshop</u>—**out of my job title**—even though I am not a veteran's counselor. <u>(I was assigned to teach the veteran's workshop largely because the previous office manager, Mr. Arthur Merlino, could not get along with veterans' LSR Mr. Juan Serrano.)</u>

In the Feb. 27 email, I also explained to Mr. Markman why someone with my condition would find it enormously difficult if not impossible to teach workshops sitting down. I forwarded to Mr. Markman the July 25, '11 letter I had emailed to DEOD explaining in detail the same. DEOD appeared to have had accepted my reasoning and explanation in July '11, as to why I would find it enormously difficult to teach workshops sitting down; but now in Feb. '12, they seemed to have changed their mind and now very evidently believe I can indeed teach workshops sitting down. Absolutely nothing about my health condition has changed in any meaningful way. What I was physically unable to do in July '11, I am still unable to do in Feb. '12. My health did not suddenly improve overnight just because DEOD decided now to deny my reasonable accommodation request. Incidentally, union officials have been aware of my RA situation since July 17, '11. This was the first time I sent Mr. Markman along with other union officials an email advising them of my situation and asking them for assistance in fending off charges of insubordination due to my inability to teach workshops as a result of my illness. I was very concerned at that time—in July '11—that my RA request would be denied by DEOD.

12

NYS Division of Human Rights Complaint, Form Last revised on 11/21/10
**<u>For Division Records Only—Not to be Sent to Employer</u>**
Mohammed Quadir

<u>Question from Page 13 *(Answered in Five Pages Below)*:</u>

**Examples of other people who were treated better than you were:**

The following six (33%) Labor Services Representatives (LSRs) out of 18 have been **<u>substantially</u> <u>treated better</u>** than me insofar as they have never been asked/required to teach workshops during the four years (since April 2008) I have been working at this Bronx DOL office:

(1) Ms. Lydia Dillard,
(2) Ms. Maritza Ortega-Candelario
(3) Mr. Daniel Garcia

(4) Ms. Ivette Colon
(5) Ms. Gregoria Martinez
(6) Ms. Mary Miller.

If the supervisors in my office claim the aforesaid six workers taught any workshops since April '08, please ask them the following questions: (A) What workshops exactly did they teach?  (B) For how long?  One year, two years, three years, and so forth?  (C) How often?  Once a week, twice a week, etc.?  (D) For how many hours?  One hour, three hours, four hours, etc.?  (E) And in which room and [13] floor?  (F) And when was the last time they taught a workshop period?

In the case of LSRs Mary Miller & Maritza Ortega-Candelario (above), they perform a valuable function in that they write/create the resumes of Spanish speaking customers with limited English skills.  However, **even they do not teach workshops with the term being defined as teaching something before an audience for let's say for at least 30 minutes.  They sit at their desk and during one-to-one sessions (not in a group workshop setting) prepare  customers' resumes.**  And in the case of LSR Mary Miller, I personally know her to be a diligent worker who tries to provide quality service to the Department's customers.  So, I don't want this to seem like I am criticizing Ms. Mary Miller personally, because I am not.

However, I guess I am critiquing the supervisors in the Bronx DOL office for creating a situation where **only 2 LSRs perhaps really do the actual work of teaching workshops on a regular basis, while the 16 other LSRs either do not teach workshops at all and have not done so since the 4 years I have been at this Bronx office or only teach a workshop once every 4 weeks or 28 days— not really even that these days due to the lack of customer demand to attend the various workshops** offered by the Bronx DOL office.  **<u>Currently there are about 18 LSRs in this Bronx DOL office.</u>**  Sometimes, the workshops are either cancelled or rescheduled to a later date—week— due to the lack of customer demand (see Attachment # 3).

*(Question 13 Continues Below: 1st of 5 pages.)*

<u>Question from Page 13 of Human Rights Complaint Continued:</u>
<u>Mohammed Quadir</u>

The following eight (44%) Labor Services Representatives (LSRs) out of 18 have been **somewhat treated better** than me insofar as they only teach workshops here once every 4 weeks or 28 days—not really even that these days—and they have been teaching these relatively newly created workshops well after April '08—at least two full years after April '08:

    (1) Sara DeJesus (Job Search Techniques Workshop—Offered on Fridays only)
    (2) Steven Goldberg (Job Search Techniques Workshop)
    (3) Nancy Ocasio (Job Search Techniques Workshop)
    (4) Frank DeLorenzo (Job Search Techniques Workshop)

    (5) Bernadette Layton (Interviewing Techniques Workshop—Offered on Thursdays only)
    (6) Nicole Niles (Interviewing Techniques Workshop)
    (7) Gloria Nunyuie (Interviewing Techniques Workshop)
    (8) Sharon Stanley Jackson (Interviewing Techniques Workshop)

There was a time during the early part of 2011 the two aforesaid workshops (Job Search and Interviewing Techniques Workshops) used to be offered twice a week. **But since the middle of 2011, these workshops have been offered only once a week due to the lack of customer demand to attend these workshops. As proof please see the August 3, '11 email (see Attachment # 3) sent by my current supervisor Ms. Noemi Ramos in which she wrote "…the Interviewing Skills Workshop will only be given once a week on Thursdays. This is due to the low volume of customers."**

**The agency (DOL DEOD) officially denied my RA request in its Feb. 14, '12, letter to me (see Attachment # 2). It did this on the false premise that due to the workload at the Bronx DOL office and the need to provide workshops by LSRs, it was no longer reasonable to approve/extend my RA request and hence my request was being denied. The implication that there is a heavy customer demand for workshops at the Bronx DOL office is not only patently absurd, but outright false. In fact, it is so utterly ridiculous that I am even surprised that it was officially put in writing on behalf of the agency by the senior DEOD official assigned to my case Mr. Joseph Kabance (Affirmative Action Administrator 3, Salary Grade 25).**

14

(Despite repeated requests, Mr. Kabance also never really answered my question as to whether those five-to-six LSRs—many of whom are very nice and kind individuals—have been granted a permanent lifetime exemption by DEOD exempting them from ever having to teach workshops. The closest Mr. Kabance came to answering my question was in a July 12, '11 email in which he wrote: "In answer to your statements about LSRs and workshop assignments in DEWS as outlined in your letters, DEOD is not involved in the management of the DEWS operation and the day to day activities of scheduling or giving workshop assignments." A copy of this email can be provided on request.)

**Additionally, the basic resume workshop—not referring to the easier Advance Resume Workshop— used to be offered three times a week on Tuesdays, Thursdays, and Fridays. Now it is being offered only twice a week on Thursdays and Fridays only due to low customer demand. Even the Advance Resume workshop, which used to be offered twice a week, is now I believe being offered once every 1 or 2 weeks.** Also the part about teaching workshops being an essential function of a LSR's job title/duties is similarly absurd. It is not an essential function as was explained in previous sections. *(Question 13 Continues Below: 2nd of 5 pages.)*

<u>Question from Page 13 of Human Rights Complaint Continued:</u>
Mohammed Quadir

I have taught workshops here—when I was healthy—for at least 2 years and 4 months.  I taught
the basic English resume workshop for about 2 years on a fulltime, regular basis every Friday.
(Incidentally, the **basic English resume workshop**, which I was assigned to teach—not the easier
Advanced Resume Workshop—, **is the most difficult, time consuming, and labor intensive of
all the workshops LSRs teach.**  This is because unlike other workshops, the resume workshop
has **at least** two different parts to it—**more than two parts I should say really**.  The first part is
the classroom/computer room instruction part where those customers who possess computer skills
are given instruction on resume writing and then escorted to the computer room where they are
shown how to use the Winway Resume software in order to create or revise their resumes—
usually it is very difficult to secure computers for most of the customers in the public
computer/resource room as most of the computers have already been assigned and are being used
by other customers who are not part of the resume class.  The second part consists of the LSR—in
this case I or it could be someone else—simply creating the resumes of customers who have no
computer skills.  Therefore, I taught the most difficult workshop here for about 2 years until I was
removed from this assignment in early September '10 by my previous supervisor—now retired—,
Ms. Cynthia Meggett, due to reasons not **directly** related to this reasonable accommodation
request.)

I was also assigned to teach the Veterans 8-Week Follow-up Workshop in October '10, by the
previous Office Manager—now retired—Mr. Arthur Merlino.  I was assigned to teach this class
**(work out of my job title)** even though I am a Labor Services Representative not a Veteran
Services Representative.  We have a Veteran Services Representative in this Bronx DOL office
named Mr. Juan Serrano.  It would seem more fitting for a Mr. Serrano—Veteran Services
Rep.—who has been trained specifically in veterans' issues to teach the workshop relating to
veterans.  However, Mr. Merlino (previous office manager) assigned me to teach the Veterans 8-
Week Follow-up Workshop—in Mr. Serrano's stead—chiefly because he could not get along
with Mr. Serrano.  He was constantly arguing and trying to discipline Mr. Serrano.  The office
manager, it was very obvious, did not like and could not get along with Mr. Serrano.  I taught this
workshop until about the end of January '11 (for about 4 months), when I had to be removed from
teaching workshops due to my illness which appeared to be steadily getting worse at that time--1st
medical note given to DOL requesting accommodation dated 1-28-11.

15

(Incidentally, I fully cooperated with Mr. Merlino's instruction and **created a 6-page lesson plan**
to teach this 90-minute Veteran's Workshop, which includes all the things he asked for including
discussion of the bonding program, Work Opportunity Tax Credit, in depth explanation of the
Finding a Job webpage on the DOL website, and so forth.  **I did so even though I was clearly
doing work out of my job title as a LSR**—I am a 'LSR' not a 'veteran's LSR.'  The Veteran's
Workshop should have been assigned to and should have been taught by Mr. Serrano who is the
veteran's LSR.  But Mr. Merlino—previous Office Manager—, as noted earlier, did not really
have a friendly, working relationship with Mr. Serrano.)

*(Question 13 Continues Below: 3rd of 5 pages.)*

<u>Question from Page 13 of Human Rights Complaint Continued:</u>
*(Question 13 Continues Below: 4th of 5 pages.)*
Mohammed Quadir

Other workers in the Bronx DOL office were also treated better than me in the sense that they **were not tricked and ambushed into teaching a workshop**. Here I am referring to the Advanced Resume Workshop.

On Wednesday, January 26, '11, I was once again assigned to teach yet another workshop with this latest one being the Advanced Resume Workshop. However, this time I was not given any prior notification that I was being assigned to teach this workshop on Wednesdays on a permanent basis in addition to teaching the Veterans 8-Week Follow-up workshop on Mondays. I was advised by one of the clerical staff at around 9:45am on Wednesday, January 26, that I was assigned to teach the Advanced Resume Workshop on a regular basis from now on and that the class should have been started at 9:30am. So I was already 15 minutes late in starting the class with anywhere from 40 to 50 customers waiting for me to begin the class. (It is possible the number of customers on that day may have even exceeded 50; I recall it being a very large class.) However, I advised her that it was not my duty to teach this class as no supervisor had informed me beforehand that I was being assigned to teach this class.

I went to discuss this issue further with Supervisor Ms. Meggett. At that moment, she was discussing this issue with another LSR, Frank Cook, who taught the Advanced Resume Workshop on Mondays. LSR Cook advised both Ms. Meggett and me that he was informed several days earlier by both Mr. Merlino (previous office manager) and Mr. Earle Dawkins (DOL Sr. Employment Counselor Supervisor) that they had personally informed me that I was being assigned to teach this newly created Advanced Resume Workshop on Wednesdays. **This is false. I was never told by anyone in this office (including Mr. Merlino) that I was being assigned to teach the Advance Resume Workshop. My previous supervisor Ms. Meggett said at the time (on January 26, '11) that she also was not informed by anyone either that I was assigned to teach the Advanced Resume Workshop on Wednesdays. She apparently was also kept out of the loop.**

16

One of the clerical staff later advised me that customer appointment letters for workshops are generally mailed anywhere from at least 7-10 days in advance. So, if the Advanced Resume Workshop is scheduled for January 26, the appointment letters advising customers to appear for the workshop would likely be mailed by January 16—10 days in advance. No one from management (including Mr. Merlino) informed me in advance that I was being assigned to teach the Advanced Resume Workshop even though this fact was known anywhere from 7-10 days prior to January 26, '11. I haphazardly taught the Advanced Resume Workshop without a real lesson plan for a total of one day before being relieved of this assignment.

**Out of the 4 years I spent being in this office, at least 2 years and 4 months were spent teaching a workshop of some kind on a regular weekly basis.** And also for most of the 2 years I spent teaching the resume workshop (until September '10), there was only one other LSR who taught workshops on a regular basis. This was Mr. Frank Cook. **Most of the other LSRs did not teach any workshops to my recollection. All the new workshops that were recently created— sometime during and after the middle of 2010—such as the Job Search Techniques Workshop and Interviewing Techniques Workshop did not exist back then.**

<u>Question from Page 13 of Human Rights Complaint Continued:</u>
*(Question 13 Continues Below: 5th of 5 pages.)*
Mohammed Quadir

I taught the basic English resume class (not the easier advanced resume class) for about two years. Then I was assigned to teach the Veterans 8-Week Follow-up workshop (**work out of my job title**) even though I am a Labor Services Representative not a Veteran Services Representative.  I was not only given the hardest classes (i.e., resume workshop) to teach but also assigned to teach a class (i.e., veteran's workshop) that really should have been assigned to someone else.  And on top of that **I was assigned to teach the Advanced Resume Workshop on January 26, '11, but I was never given prior notice of this assignment.**  So I attempted to teach a class of 40-50 customers without any real preparation and without a formal lesson plan.

Since my reasonable accommodation request is being denied, then **I have to ask whether those 6 LSRs who do not teach workshops of any kind have been granted a permanent exemption from having to teach workshops.  It is a perfectly fair and legitimate question to ask.  Also, have all of them been asked to obtain (and granted) approval from DEOD via the reasonable accommodation request process to be permanently exempt from teaching workshops?  If not, then why am I being subjected to discriminatory and unfair treatment?  Why I am being forced to go through DOL's elaborate reasonable accommodation process only to be denied when others are not?  And why have I traditionally been given the most difficult assignments (i.e., teaching the resume workshop) and assigned work, out of my job title, that should have been performed by others all along (such as the Veterans 8-Week Follow-up workshop)?  And why was I assigned to teach the Wednesday Advanced Resume Class on January 26, '11, without even being given prior notice?** 17

It took me 3 months to write this 17-page narrative explaining and detailing this complaint.  Had I been healthy I would have been able to submit this complaint much earlier.  Just having to go through this process is causing me added stress and hardship.  **When reviewing this complaint please keep in mind that at least 77% (14/18 LSRs) of the LSRs in this Bronx office have been treated substantially or somewhat better than me** insofar as teaching workshops is concerned.  **DEOD never really answered my question as to whether those 6 LSRs have been granted a permanent lifetime exemption from having to teach workshops.  My accommodation request was denied even though I have a medically documented record of illness.**  Thank you for your assistance regarding this matter.  My health and my livelihood depend on it.