UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Mohammed Quadir**, | |
| Plaintiff, | No. 13-cv-3327 |
| – against – | Judge Oetken |
| **New York State Department of Labor**, | |
| Defendant. | |

**Corrected Memorandum of Law in Support of
Defendant's Motion to Dismiss
Plaintiff's Amended Complaint and
Comprehensive Consolidated Supplemental Pleading**

ERIC T. SCHNEIDERMAN
New York State Attorney General
*Attorney for Defendant New York State
Department of Labor*

Garrett Coyle
Assistant Attorney General
120 Broadway, 24th floor
New York, NY 10271
(212) 416-6696
Garrett.Coyle@ag.ny.gov
*Of Counsel*

Dated:     June 20, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION  ......................................................................................... 1

ALLEGED FACTS  ....................................................................................... 2

      A.    The Department Hires Mr. Quadir As a
           Labor Services Representative .............................................. 2

      B.    Onset of Symptoms and First Accommodation Request......................... 3

      C.    The Second Accommodation Request ...................................... 3

      D.    The Third and Fourth Accommodation Requests ................................. 4

      E.    The Department's Response ................................................. 5

      F.    State and Federal Administrative Adjudications .................................. 6

      G.    This Action................................................................. 6

      F.    Post-Filing Events ......................................................... 7

LEGAL STANDARD........................................................................................ 8

ARGUMENT .................................................................................................. 10

POINT I:    THE DEPARTMENT DID NOT REFUSE ANY REQUESTED
             REASONABLE ACCOMMODATION THAT MR. QUADIR
             DOCUMENTED A NEED FOR............................................. 11

      A.    The Department Granted All of Mr. Quadir's
           Pre-2012 Accommodation Requests........................................ 11

      B.    The Department's Provision of a High Chair And a Lectern
           For Teaching Workshops Was a Reasonable Accommodation
           Because Mr. Quadir Did Not Provide Medical Documentation
           of His Alleged Need To Be Excused From Teaching Workshops
           Entirely .................................................................. 12

POINT II:   THE DEPARTMENT DID NOT SUBJECT MR. QUADIR TO ANY
             ADVERSE EMPLOYMENT ACTIONS BECAUSE OF HIS
             DISABILITY ............................................................... 20

POINT III:   MR. QUADIR'S RETALIATION CLAIM
SHOULD BE DISMISSED ................................................................... 23

A.   The Counseling Memo, Performance Evaluations, and Write-Up
Are Too Immaterial To Constitute Adverse Employment Actions ....... 23

B.   The Department's Unsuccessful Attempt To Deny Mr. Quadir Pay
For a State Holiday Is Also Too Immaterial To Constitute
an Adverse Employment Action ........................................................... 24

C.   The Department Is Not Liable For Denying Mr. Quadir's Request
For an Exemption From Its Normal Leave Policy
To Litigate This Case ........................................................................... 25

D.   The 2014 Performance Evaluation Is Not an Actionable Act of
Retaliation Because Mr. Quadir Fails To Allege Any Causal
Connection Between That Evaluation and This Action ........................ 26

CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Allaire Corp. v. Okumus,*
   433 F.3d 248 (2d Cir. 2006) ......................................................................... 9

*Arista Records, LLC v. Doe 3,*
   604 F.3d 110 (2d Cir. 2010) ......................................................................... 9

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................... 9

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544, 570 (2007) ............................................................................. 9

*Bergeron v. Northwestern Publications, Inc.,*
   No. 94-cv-1124, 1996 U.S. Dist. LEXIS 15511 (D. Minn. Jan. 12, 1996) ....... 16, 18

*Board of Education of the University of Alabama v. Garrett,*
   531 U.S. 356 (2001) ................................................................................... 10

*Brown v. Pension Boards,*
   488 F. Supp. 2d 395 (S.D.N.Y. 2007) ....................................................... 19

*Castro-Medina v. Proctor & Gamble Commercial Co.,*
   565 F. Supp. 2d 343 (D.P.R. 2008) ....................................................... 21, 24

*Coaker v. Home Nursing Services,*
   No. 95-cv-0120, 1996 U.S. Dist. LEXIS 1821 (S.D. Ala. Feb. 5, 1996) ................ 17

*Effie Film, LLC v. Pomerance,*
   909 F. Supp. 2d 273 (S.D.N.Y. 2012) ............................................... 9, 13

*Feingold v. New York,*
   366 F.3d 138 (2d Cir. 2004) ....................................................................... 10

*Galabya v. New York City Board of Education,*
   202 F.3d 636 (2d Cir. 2000) ....................................................................... 21

*Goldblatt v. Geiger,*
   867 F. Supp. 2d 201 (D.N.H. 2012) .......................................................... 24

*Goonan v. Federal Reserve Bank of New York,*
   916 F. Supp. 2d 470 (S.D.N.Y. 2013) ............................................... 10, 13

*Graves v. Finch Pruyn & Co.,*
　　457 F.3d 181 (2d Cir. 2006).................................................................... 10, 13

*Heilweil v. Mount Sinai Hospital,*
　　32 F.3d 718 (2d Cir. 1994)............................................................................ 20

*MacEntee v. International Business Machines,*
　　471 F. App'x 49 (2d Cir. 2012)..................................................................... 12

*Mandavia v. Columbia University,*
　　912 F. Supp. 2d 119 (S.D.N.Y. 2012) ............................................................ 9

*McCarthy v. Dun & Bradstreet Corp.,*
　　482 F.3d 184 (2d Cir. 2007)............................................................................ 9

*Miller v. National Casualty Co.,*
　　61 F.3d 627 (8th Cir. 1995) .......................................................................... 16

*Mistretta v. Volusia County Department of Corrections,*
　　61 F. Supp. 2d 1255 (M.D. Fla. 1999) .......................................................... 17

*Morales v. Georgia Department of Human Resources,*
　　446 F. App'x 179 (11th Cir. 2011) ............................................................... 23

*National Labor Relations Board v. Rockaway News Supply Co.,*
　　197 F.2d 111 (2d Cir. 1952) .......................................................................... 25

*Rask v. Fresenius Medical Care North America,*
　　No. 05-cv-1267, 2006 U.S. Dist. LEXIS 78251 (D. Minn. Oct. 26, 2006)............. 17

*Regents of the University of California v. Doe,*
　　519 U.S. 425 (1997) ...................................................................................... 10

*Rodal v. Anesthesia Group of Onondaga, P.C.,*
　　369 F.3d 113 (2d Cir. 2004) .......................................................................... 12

*Salisbury v. Art Van Furniture,*
　　938 F. Supp. 435 (W.D. Mich. 1996) ............................................................ 19

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
　　183 F.3d 155 (2d Cir. 1999)..................................................................... 22, 24

*Slattery v. Swiss Reinsurance American Corp.,*
　　248 F.3d 87 (2d Cir. 2001) ............................................................................ 23

*Stola v. Joint Industries Board,*
　　889 F. Supp. 133 (S.D.N.Y. 1995) ............................................................... 17

*Sweeney v. W.*,
   149 F.3d 550 (7th Cir. 1998) ........................................................................ 21, 23

*Taylor v. Principal Financial Group*,
   93 F.3d 155 (5th Cir. 1996) ........................................................................... 18

*Triestman v. Federal Bureau of Prisons*,
   470 F.3d 471 (2d Cir. 2006) ............................................................................ 9

*Wimberly v. United States Department of Education*,
   12-cv-7773, 2013 U.S. Dist. LEXIS 165836 (S.D.N.Y. Nov. 21, 2013) .................. 9

*Young v. Westchester County Department of Social Services*,
   57 F. App'x 492 (2d Cir. 2003) ................................................................... 19, 22

## Statutes and Regulations                                                    Page

42 U.S.C. § 12203 ........................................................................................... 11, 24

42 U.S.C. § 12112 ............................................................................ 10, 11, 13, 19

N.Y. Senate Bill S2362-2013 ................................................................................ 10

29 C.F.R. part 1630 app'x ..................................................................................... 14

76 Fed. Reg. 16978, 16985 ................................................................................... 14

## Other Authorities                                                           Page

United States Equal Employment Opportunity Commission,
   A Technical Assistance Manual on the Employment Provisions (Title I)
   of the Americans With Disabilities Act § 3.6 (1992) .......................................... 14

## INTRODUCTION

Pro se plaintiff Mohammed Quadir brings this disability discrimination action against the New York State Department of Labor, where he is employed as a labor services representative — a position that involves, among other duties, teaching job skills workshops to unemployed customers. Mr. Quadir, who suffers from Major Depressive Disorder, alleges that the Department refused to accommodate his disability when — despite requesting medical documentation of his disability and receiving only a doctor's note asking that Mr. Quadir be "excuse[d] . . . from prolonged standing work duties or any activity requiring considerable physical exertion" — the Department offered him a high chair and lectern so that he could teach workshops while sitting down, rather than excusing him from teaching workshops entirely.

Mr. Quadir's failure-to-accommodate claim should be dismissed. The complaint admits that the Department granted all of Mr. Quadir's requested accommodations in full while he sought a medical diagnosis for his condition. Those accommodations were reasonable as a matter of law. Moreover, once Mr. Quadir was diagnosed with Major Depressive Disorder, the Department's offer of a high chair and lectern fully addressed the limitations listed in his doctor's note — i.e., prolonged standing and considerable physical exertion. That accommodation, too, was reasonable as a matter of law. Although Mr. Quadir claims he told the Department that his disability prevented him from teaching workshops entirely, he admits that he gave the Department no medical documentation substantiating that

alleged limitation, despite the Department's request. Where — as here — an employee requests an accommodation but fails to provide requested medical documentation of his limitations, the employer is deemed not to have "known of" those limitations and thus cannot be liable for failing to accommodate them.

In addition to his failure-to-accommodate claim, Mr. Quadir also asserts an adverse employment action claim, alleging that the Department threatened to charge him with insubordination and assigned him to teach more workshops than other labor services representatives. However, the mere *threat* of an insubordination charge is too minor as a matter of law to constitute an adverse employment action. And the Department cannot, as a matter of law, be deemed to have made the allegedly disparate workshop assignments "because" of Mr. Quadir's disability because he admits that the alleged disparity *predates* the onset of his disability. Thus, the adverse employment action claim should be dismissed.

Finally, Mr. Quadir's retaliation claim should also be dismissed. Mr. Quadir does not allege beyond a bare conclusion that the Department took any of the alleged retaliatory actions "because" he filed this lawsuit.

## ALLEGED FACTS

### A.   The Department Hires Mr. Quadir As a Labor Services Representative

The Department hired Mohammed Quadir as a labor services representative in the Department's Bronx office in April 2008. Am. Compl., ECF No. 5-2, at 7.

Mr. Quadir's primary duty as a labor services representative is to conduct interviews with unemployed individuals who receive unemployment benefits. Am.

2

Compl., ECF No. 5-3, at 7. In addition, since the start of his employment, Mr.

Quadir has been assigned to teach workshops to groups of unemployed individuals

to help them get back on the job market. Ordinarily, teaching a workshop entails

standing in front of a classroom of 5–60 people and instructing them in a particular

skill for between 30 minutes and four hours. Supp. Pleading, ECF No. 35 at 10–11.

Mr. Quadir alleges that most of the other labor services representatives in the

Bronx office have not taught workshops during his tenure. *Id.* at 15, 20.

**B.     Onset of Symptoms and First Accommodation Request**

Mr. Quadir began in late 2010 to experience fatigue, headaches, difficulty

concentrating, lightheadedness and balance problems, and dry, tired, and sleepy

eyes. Supp. Pleading, ECF No. 35 at 8–10. Mr. Quadir saw a cardiologist and a

primary care physician for these symptoms in December 2010 and January 2011.

Neither doctor diagnosed him with a disease, but both referred him to specialists for

further examination and treatment. *Id.* at 6.

Mr. Quadir submitted notes to the Department from both doctors in January

and February 2011 requesting that he be excused from public speaking and

prolonged standing for two months while he underwent further diagnostic tests. *Id.*

at 6. His supervisor granted those accommodations — including exempting him

from teaching workshops. *Id.* at 6.

**C.     The Second Accommodation Request**

When his first accommodation expired, Mr. Quadir submitted a reasonable

accommodation request form in April 2011. Supp. Pleading, ECF No. 35, at 7. He

attached a note from his neurologist that did not diagnose Mr. Quadir with a disease but that asked that he be excused from prolonged standing work responsibilities due to medical issues. *Id.* at 7. The note did not mention the duration of the requested accommodation. Mr. Quadir also attached his own narrative explaining his symptoms and the nature and duration of his requested accommodation. *Id.* at 7.

In response, the Department asked Mr. Quadir to provide additional medical documentation of his illness and the specific limitations that the illness had on Mr. Quadir's ability to do his job. *Id.* at 7.

Mr. Quadir submitted another note from his neurologist listing his symptoms and requesting that he be excused from prolonged standing work until August 2011. *Id.* at 7–8. Mr. Quadir also submitted his own two-page letter explaining why he felt he could not teach workshops even if he were able to sit down. *Id.* at 8–9.

The Department approved his accommodation request in July 2012, again exempting him from teaching workshops through August 2011. Am. Compl., ECF No. 5-5, at 28. The Department told him that at the end of the accommodation period, he would resume his regular work schedule "pending any new medical information submitted or new request for reasonable accommodation." *Id.*

## D.    The Third and Fourth Accommodation Requests

When Mr. Quadir's second accommodation expired, he submitted another note from his neurologist in August 2011 again listing his symptoms and again

requesting a four-month extension of his accommodation from prolonged standing work. Supp. Pleading, ECF No. 35, at 9.

The Department approved Mr. Quadir's requested extension — including from teaching workshops — through December 2011. Am. Compl., ECF No. 5-5, at 36. The Department again told Mr. Quadir that at the end of the accommodation period, he would resume his regular work schedule "pending any new medical information submitted or new request for reasonable accommodation." *Id.*

Mr. Quadir requested a four-month extension of his accommodation in December 2011. Supp. Pleading, ECF No. 35, at 10. He attached a note from his psychiatrist listing his symptoms, diagnosing him for the first time with Major Depressive Disorder, and asking that he be "excused 'from prolonged standing work duties' [and] 'any activity requiring considerable physical exertion.'" Am. Compl., ECF No. 5-5, at 39.

The Department mishandled this accommodation request and failed to respond in a timely manner. Supp. Pleading, ECF No. 35, at 13. However, upon learning of its error, the Department approved a temporary extension — including from teaching workshops — while it considered his request. *Id.* at 13.

## E.   The Department's Response

The Department responded to Mr. Quadir's request by letter in February 2012. Am. Compl., ECF No. 5-5, at 44. The letter explained that the Department had granted his requested accommodation for more than a year while he sought treatment. *Id.* However, because of the Bronx office's need to provide workshops,

the Department denied his request for a four-month extension of his existing

accommodation — i.e., from teaching workshops. *Id.* Instead, the Department

"offer[ed] [Mr. Quadir] a means to perform [his] job, including delivering workshops,

by providing you with suitable equipment and rooms to deliver workshops and other

duties sitting down. Suitable equipment will include a high chair and lectern to

conduct workshops. This accommodation will address your need to not have

prolonged standing work duties." *Id.*

Mr. Quadir alleges that his supervisor threatened to charge him with

insubordination if he refused to teach workshops with the high chair and lectern.

Supp. Pleading, ECF No. 35, at 11.

## F.     State and Federal Administrative Adjudications

After receiving the Department's letter, Mr. Quadir filed a charge with the

New York State Department of Human Rights in May 2012. Am. Compl., ECF No.

5-1, at 1–11. The state agency dismissed the charge in December 2012, concluding

that the Department provided Mr. Quadir with a reasonable means to perform an

essential job function by offering him the use of a lectern and a higher chair.

Mr. Quadir then filed a charge with the U.S. Equal Opportunity Employment

Commission. The EEOC dismissed his charge, adopting the findings of the state

agency. Am. Compl., ECF No. 5, at 5.

## G.     This Action

Mr. Quadir then filed this action under Title I of the Americans With

Disabilities Act, the New York State Human Rights Law, and the New York City

Human Rights Law. *Id.* at 1. He seeks an order requiring the Department to approve his accommodation request, $125,000 in damages, and fees. *Id.* at 4.

## H.   Post-Filing Events

After Mr. Quadir filed this action, the Department gave a negative counseling memo in June 2013, a negative performance evaluation for the period from April 2012 through April 2013, another performance evaluation for the same period falsely stating that he did not work in the office's resource room during the evaluation period, and a negative interim performance evaluation for the period from April 2013 through April 2014.[1] Supp. Pleading, ECF No. 35, at 26–28. Mr. Quadir does not allege that any of those memos or evaluations affected his salary, benefits, title, or job responsibilities. *Id.* at 26–28. Mr. Quadir also alleges that his supervisor unfairly wrote him up in April 2014 for taking too long in his customer interviews. *Id.* at 28–30. He does not claim that his supervisor wrote him up

---

[1]    The performance evaluations are not in fact "negative." One rates Mr. Quadir's overall performance as "satisfactory" (on a scale in which the only choices are "satisfactory" and "unsatisfactory"). *See* MTD Opp'n, ECF No. 20, at 52. Another does not give Mr. Quadir an overall performance rating because it was merely an interim certification, not a final rating. *See* MTD Opp'n, ECF No. 20-1, at 7.

In addition, the documents accompanying Mr. Quadir's opposition papers contain several admissions that the timeliness and attendance problems cited in the counseling memo are well-founded. *See* MTD Opp'n, ECF No. 20, at 36 ("I will readily admit I do have some issues with not always being able to report to work on time at 9am" and "[w]hile there have [*sic*] been at least some improvement relating to my tardiness, I fully concede there is still room for improvement"); *id.* at 42 ("I often report to work at or around 10am instead of 9am, which is the beginning of the workday"); MTD Opp'n, ECF No. 20-1, at 5 ("[I]n the not too distant past, I used to report to work at around 10am. . . . This week the latest I have reported to work is I believe 9:15am, just 15 minutes after official start of my work day").

because he filed this action or that the write-up affected his salary, benefits, title, or job responsibilities. *Id.* at 28–30.

In addition, Mr. Quadir's supervisor charged him as having taken leave without pay on Washington's Birthday (a state holiday) in February 2014. *Id.* at 27. Mr. Quadir does not know whether the error was a genuine mistake or an act of retaliation. *Id.* at 27. Mr. Quadir was able to correct the erroneous charge and was paid for the holiday. *Id.* at 27; *see also* MTD Surreply Br., ECF No. 24, at 9 n.10.

Mr. Quadir also alleges that the Department has not allowed him to take unpaid leave time to litigate this case. *Id.* at 30. He does not allege that the Department's normal leave policy permits employees to take unpaid leave to litigate a case; rather, he asked for an exception to the Department's normal leave policy (which does not allow such leave). *Id.* at 30.

Finally, Mr. Quadir alleges that the Department gave him a negative and inaccurate performance evaluation for the period from April 2013 through April 2014 that prevented him from receiving an automatic pay raise. *Id.* at 30–35. He alleges no facts suggesting that the performance evaluation was related to his filing of this action other than that it was "of course . . . a deliberate act of retaliation against me for exercising my rights under the ADA." *Id.* at 32.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court, "accept[ing] as true all well-pleaded factual allegations in the complaint, and 'draw[ing] all inferences in the plaintiff's favor,'" but disregarding "'mere conclusory

statements'" and "'formulaic recitations of the elements of a cause of action,'" must dismiss the complaint if it lacks "sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 125–26 (S.D.N.Y. 2012) (Oetken, J.) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006), *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court may also consider "'documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 290 (S.D.N.Y. 2012) (Oetken, J.) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).

Although pro se complaints "are read with a 'special solicitude' to raise the 'strongest [claims] that they suggest,'" even a pro se plaintiff is not excused from this pleading standard. *Wimberly v. U.S. Dep't of Educ.*, 12-cv-7773, 2013 U.S. Dist. LEXIS 165836, at *3 (S.D.N.Y. Nov. 21, 2013) (Oetken, J.) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006)) (alteration in original).

## ARGUMENT

Title I of the Americans With Disabilities Act[2] says that "no [employer covered by the Act] shall discriminate against a qualified individual with a

---

[2]     Mr. Quadir purports to bring a claim against the Department under Title I of the Americans With Disabilities Act, 42 U.S.C. §§ 12112–12117. However, a federal action against a state agency like the Department is deemed an action against the state and is thus barred by Eleventh Amendment immunity unless that immunity has been abrogated by Congress or waived by the state.

9

disability because of the disability of such individual."³ 42 U.S.C. § 12112(a). Title I

defines "discriminate" to include both (1) "not making reasonable accommodations

to the known physical or mental limitations of an otherwise qualified individual

with a disability" (a "failure-to-accommodate" claim), and (2) "limiting, segregating,

or classifying a[n] employee in a way that adversely affects the opportunities or

status of such . . . employee because of the disability of such . . . employee" (an

"adverse employment action" claim). 42 U.S.C. § 12112(b)(1) & (5)(A).

---

*See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997). Title I does not abrogate Eleventh Amendment immunity. *See Bd. of Educ. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001). And although the New York legislature has considered doing so, *see* N.Y. Senate Bill S2362-2013, New York has not waived its immunity for violations of the Act. Thus, the Eleventh Amendment bars Mr. Quadir's ADA claim.

Nevertheless, under the Rehabilitation Act of 1973 — which imposes the same disability discrimination prohibitions as Title I of the ADA, *see* 29 U.S.C. § 794(d) — state agencies receiving federal funding have waived their immunity for Rehabilitation Act claims. 29 U.S.C. § 794(a) & (b)(1)(A). Because the complaint could be read to assert a Rehabilitation Act claim, we go beyond the Eleventh Amendment and address the merits of the complaint.

³ Disability discrimination claims under New York state law are governed by the same standards as federal claims under the ADA and the Rehabilitation Act. *See Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 479 n.1 (S.D.N.Y. 2013) (Oetken, J.) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 186 n.3 (2d Cir. 2006)).

New York City law claims against a state agency like the Department are barred by state sovereign immunity. *See Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ("[T]he claim against the DMV brought pursuant to the NYCHRL is also barred by state sovereign immunity. The City of New York does not have the power to abrogate the immunity of the State, and we have found no evidence that the State has consented to suit in federal court under the NYCHRL.").

10

The Act also prohibits employers from "discriminat[ing] against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter" (a "retaliation" claim). 42 U.S.C. § 12203(a).

## POINT I

**THE DEPARTMENT DID NOT REFUSE ANY REQUESTED REASONABLE ACCOMMODATION THAT MR. QUADIR DOCUMENTED A NEED FOR**

### A.    The Department Granted All of Mr. Quadir's Pre-2012 Accommodation Requests

Mr. Quadir admits that the Department granted in full every accommodation that he requested through December 2011. In particular, the complaint alleges that:

- Mr. Quadir submitted two doctor's notes in January and February 2011 requesting that he be excused from public speaking and prolonged standing while he underwent further diagnostic tests. His supervisor granted those accommodations — including exempting him from teaching workshops. Supp. Pleading, ECF No. 35, at 6.

- Mr. Quadir submitted a reasonable accommodation request form in April 2011. When the Department requested additional medical documentation, Mr. Quadir submitted a doctor's note requesting that he be excused from prolonged standing work until August 2011. The Department approved his accommodation request, again exempting him from teaching workshops. However, the Department told Mr. Quadir that at the end of the accommodation period, he would be required to resume his regular work duties unless he submitted more medical information. *Id.* at 7–9.

- Mr. Quadir submitted another note from his neurologist in August 2011 requesting a four-month extension of his accommodation from prolonged standing work. The Department approved an extension — including from teaching workshops — through December 2011. *Id.* at 9.

- Mr. Quadir requested a four-month extension of his accommodation in December 2011 accompanied by a note from his psychiatrist diagnosing him with Major Depressive Disorder and asking that he be excused from prolonged standing work and physical exertion. The Department mishandled this accommodation request and failed to respond in a timely manner, but upon learning of its error, the Department approved a temporary extension — including from teaching workshops — while it considered his request. *Id.* at 13.

Thus, because the complaint admits that the Department granted all of Mr. Quadir's reasonable accommodation requests through December 2011, Mr. Quadir cannot maintain a failure-to-accommodate claim for that period of time. *See MacEntee v. Int'l Bus. Machs.*, 471 F. App'x 49, 50 (2d Cir. 2012) ("With respect to MacEntee's failure to accommodate claim, IBM accommodated her disability, and following transfer to a different department, MacEntee continued to be accommodated. Thus her claim fails as a matter of law.") (citing *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

**B.    The Department's Provision of a High Chair And a Lectern For Teaching Workshops Was a Reasonable Accommodation Because Mr. Quadir Did Not Provide Medical Documentation of His Alleged Need To Be Excused From Teaching Workshops Entirely**

The primary basis of Mr. Quadir's complaint is that in February 2012 the Department denied his request for a four-month extension of his existing accommodation — the first and only requested accommodation that the Department allegedly refused. Supp. Pleading, ECF No. 35, at 10–12, 14–22. However, Mr. Quadir admits that the Department did not deny his request entirely; instead, the Department offered to provide him with a high chair and a lectern to help him teach

workshops. *Id.* at 10. That accommodation was reasonable as a matter of law because the doctor's note[4] that Mr. Quadir submitted with his request asked that he be excused only from "'prolonged standing work duties or any activity requiring considerable physical exertion.'" Am. Compl., ECF No. 5-5, at 39.

An employer is not liable for failing to make a reasonable accommodation unless the employer *knew of* the employee's physical or mental limitations. *See* 42 U.S.C. § 12112(b)(5)(A) (requiring reasonable accommodations "to the *known* physical or mental limitations of an otherwise qualified individual with a disability") (emphasis added); *see also Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 478–79 (S.D.N.Y. 2013) (Oetken, J.) ("'In so-called reasonable-accommodation cases . . . the plaintiff's burden [of establishing a prima facie case] requires a showing that . . . *an employer covered by the statute had notice of his disability . . . .*'") (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 183–84 (2d Cir. 2006)) (emphasis added).

The Equal Opportunity Employment Commission, charged with interpreting Title I of the Act, has explained that when an employee's need for an accommodation is not obvious, the employer may require the employee to provide medical documentation of the need for accommodation before the employer will be deemed to "know of" the employee's limitations:

---

[4]     The Court may consider the psychiatrist's note and the Department's letter — "'documents attached to the complaint as exhibits'" — on this motion to dismiss. *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 290 (S.D.N.Y. 2012) (Oetken, J.).

> Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of the individual with a disability that is known to the employer.  Thus, an employer would not be expected to accommodate disabilities of which it is unaware. . . . In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed. *When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.*

29 C.F.R. part 1630 app'x (emphasis added); *see also* 76 Fed. Reg. 16978, 16985

(Mar. 25, 2011) ("[T]he Commission has stated repeatedly in numerous policy

documents and technical assistance publications that *individuals requesting*

*accommodation must provide certain supporting medical information if the employer*

*requests it*, and that the employer is permitted to do so if the disability and/or need

for accommodation are not obvious or already known.") (emphasis added); U.S.

E.E.O.C., A Technical Assistance Manual on the Employment Provisions (Title I) of

the Americans With Disabilities Act § 3.6 (1992) ("*If an applicant or employee*

*requests an accommodation and the need for the accommodation is not obvious, or if*

*the employer does not believe that the accommodation is needed, the employer may*

*request documentation of the individual's functional limitations to support the*

*request*. For example: An employer may ask for written documentation from a

doctor, psychologist, rehabilitation counselor, occupational or physical therapist,

independent living specialist, or other professional with knowledge of the person's

functional limitations. Such documentation might indicate, for example, that this

person cannot lift more than 15 pounds without assistance.") (emphasis added)

(available at http://goo.gl/MB5fJc).

14

Here, Mr. Quadir admits he did not provide sufficient medical documentation to put the Department on notice of his alleged need to be excused from teaching workshops entirely. Mr. Quadir's alleged limitations were not obvious. All of the symptoms he experienced were subjective — fatigue, headaches, difficulty concentrating, lightheadedness and balance problems, and dry, tired, and sleepy eyes. *See* Supp. Pleading, ECF No. 35 at 10. A supervisor observing Mr. Quadir would not know of his disability — let alone that his disability might prevent him from teaching workshops entirely.

Accordingly, when Mr. Quadir requested to be exempt from teaching workshops, the Department granted him a temporary exemption but told him that, when the accommodation period ended, he would need to provide new medical documentation supporting his need for an exemption. *See id.* at 22. But the sole medical documentation that Mr. Quadir submitted was a note from his psychiatrist diagnosing him with Major Depressive Disorder and asking that he be "'excuse[d] . . . from prolonged standing work duties or any activity requiring considerable physical exertion due to his medical diagnosis.'" *Id.* at 10.

In response, the Department offered Mr. Quadir a high chair and lectern so that he could teach workshops while sitting down. *Id.* at 10. That accommodation fully addressed the limitations for which Mr. Quadir had provided medical documentation — i.e., prolonged standing and considerable physical exertion.

Nevertheless, Mr. Quadir claims that the high chair and lectern were an insufficient accommodation because he told the Department that he could not teach

15

workshops even while sitting down. *Id.* at 11. In particular, Mr. Quadir alleges that he e-mailed the Department in July 2011 claiming that he could not project his voice in a sustained fashion and that his difficulty concentrating prevented him from interacting with more than one person at a time. *See* Am. Compl., ECF No. 5-5, at 52–53. But he does not allege that he provided any medical documentation substantiating those limitations in response to the Department's request. To the contrary, the psychiatrist's note he provided did not indicate that his diagnosis prevented him from teaching while sitting down. *See id.* at 39.

Courts faced with these situations — in which an employee requested an accommodation but failed to provide requested medical documentation of her limitations — have held that the employer did not "know of" those limitations and thus is not liable for failing to accommodate them. *See, e.g., Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995) (where employee's disability was not obvious, employer was entitled to documentation of her need for accommodation, and employer was not on notice of need for accommodation because sole documentation provided by employee was "a single medical excuse from a nurse practitioner diagnosing her illness as 'situational stress reaction,' and releasing [her] from work until October 23"); *Bergeron v. Nw. Publ'ns, Inc.*, No. 94-cv-1124, 1996 U.S. Dist. LEXIS 15511, at *17–21 (D. Minn. Jan. 12, 1996) (when doctors' letters provided to employer stated only that employee's diabetes "required that he work a consistent shift, allowing him to control his diabetes by establishing stable routines for his work, diet, medication and exercise," employer was not liable for assigning

employee to 11am–6pm shift rather than employee's requested 10am–5pm shift;
"This shift was compatible with Plaintiff's medical condition, allowing him to
establish routines for work, diet, medication and exercise as Plaintiff's doctors had
advised. Nothing in the documentation provided by Plaintiff's doctors indicated that
Plaintiff could not work these hours . . . . The information known to the Defendant
[at the time] was that Plaintiff needed a consistent schedule. Plaintiff was placed on
a consistent schedule, from 11:00 a.m. to 6:00 p.m. Plaintiff's 'known disability,'
based on the medical documentation presented to Defendant, did not require that
Plaintiff be on a 10:00 a.m. shift as requested in the Complaint.").[5]

---

[5]     *See also, e.g.*, *Stola v. Joint Indus. Bd.*, 889 F. Supp. 133, 135–36 (S.D.N.Y.
1995) (employer was not "aware of" employee's limitations because although
employee allegedly suffering from general anxiety disorder contended that
employer was on notice of his mental disorder, he gave employer doctor's note
"attesting to his ability to return to work without restriction"); *Mistretta v.
Volusia Cnty. Dep't of Corr.*, 61 F. Supp. 2d 1255, 1263 (M.D. Fla. 1999)
(employer was not "aware of" employee's limitations because although
employer "may have been aware that the plaintiff suffered from emotional
problems and stress," "all of the medical personnel who treated the plaintiff
when he was employed by the defendant County concluded that his panic
disorder did not substantially limit his major life activities" and "[n]one of the
doctors indicated that [the plaintiff] had any mental limitation which needed
accommodation"); *Coaker v. Home Nursing Servs.*, No. 95-cv-0120, 1996 U.S.
Dist. LEXIS 1821, *39–40 (S.D. Ala. Feb. 5, 1996) (employee's expressed
desire not to perform clinical skilled nursing was "simply not enough to have
put [her employer] on notice that [she] had a disability and needed an
accommodation" when "she never produced medical verification that she had
a disability that prevented her from performing the essential functions of her
job"); *Rask v. Fresenius Med. Care N. Am.*, No. 05-cv-1267, 2006 U.S. Dist.
LEXIS 78251, at *46 (D. Minn. Oct. 26, 2006) (employer not "aware of"
employee's limitations because although employee argued that her
supervisors knew of her depression, she "never submitted any written
documentation about her depression, treatment, or medication to her
employer until after she was terminated"); *Taylor v. Principal Fin. Grp.*, 93
F.3d 155, 165 (5th Cir. 1996) ("When dealing in the amorphous world of

Mr. Quadir argues that because the Department had granted his earlier accommodation requests and excused him from teaching workshops entirely, the Department — upon receiving the new doctor's note — had to either continue that prior accommodation or give him a chance to present medical documentation justifying his continued need for that accommodation. Supp. Pleading, ECF No. 35, at 12. But the Department's earlier accommodations were *temporary* — by the terms of his own doctor's notes — while he underwent further diagnostic tests. *See* Am. Compl., ECF No. 5-2, at 1. Once he presented a new doctor's note diagnosing him with a particular illness and explaining his functional limitations from that illness — which did not include public speaking or teaching workshops while sitting down — the Department cannot be charged with knowledge (on pain of liability under the Act) that he had a disability requiring a complete exemption from teaching workshops. To hold otherwise would make the Department liable under the Act for taking the new doctor's note at face value. That contention was rejected in *Bergeron v. Northwest Publications, Inc.*, No. 94-cv-1124, 1996 U.S. Dist. LEXIS 15511 (D. Minn. Jan. 12, 1996), where an employer who received a doctor's note asking that the plaintiff be assigned to a "regular" shift could not be liable for assigning the plaintiff to a consistent 11am–6pm shift, even though the plaintiff demanded that the employer assign him to the 10am–5pm shift instead. *See* 1996 U.S. Dist. LEXIS 15511, at *17–21. Likewise, here, the Department, upon receiving

---

mental disability, we conclude that health-care providers are best positioned to diagnose an employee's disabilities, limitations, and possible accommodations.").

a doctor's note asking that Mr. Quadir be excused from prolonged standing and considerable physical exertion, cannot be liable for offering Mr. Quadir a high chair and a lectern, even though Mr. Quadir demanded more. *See id.*; *see also, e.g.*, *Brown v. Pension Bds.*, 488 F. Supp. 2d 395, 401, 403, 406 (S.D.N.Y. 2007) (employer did not "know of" — and thus could not be held liable for failing to accommodate — plaintiff's disabling mental condition when note from plaintiff's doctor said only that plaintiff's chronic illness prevented him from working until a certain date and plaintiff failed to appear for work after that date, even though plaintiff's mother told employer that plaintiff was in "a breakdown condition" after that date).

Mr. Quadir also argues that the Department should have known that a high chair and lectern would not fully accommodate the *symptoms* listed in the doctor's note — i.e., difficulty concentrating, fatigue, headaches, lightheadedness/balance problems, and dry/tired sleepy eyes. Supp. Pleading, ECF No. 35, at 10. But the Act requires an employer to accommodate a disabled employee's "known physical or mental *limitations*" — not the employee's known *symptoms*. *See* 42 U.S.C. § 12112(b)(5)(A) (emphasis added); *see also Young v. Westchester Cnty. Dep't of Soc. Servs.*, 57 F. App'x 492, 494–95 (2d Cir. 2003) (although employer knew that plaintiff had trouble breathing and speaking, employer was not on notice that plaintiff had disability within meaning of Act and thus could not be liable for failing to accommodate that disability); *Salisbury v. Art Van Furniture*, 938 F. Supp. 435, 438 (W.D. Mich. 1996) (although medical history provided to employer listed plaintiff's arthritis and joint problems, those symptoms were insufficient to put

19

employer on notice that plaintiff had disability — that is, "physical or mental impairment that substantially limit[ed] one or more of [his] major life activities"). The only *limitations* mentioned in Mr. Quadir's doctor's note — and thus the only ones "known" to the Department — were prolonged standing and considerable physical exertion. Supp. Pleading, ECF No. 35, at 10. The Department's offer of a high chair and lectern fully accommodated those limitations and was thus reasonable as a matter of law.

## POINT II

### THE DEPARTMENT DID NOT SUBJECT MR. QUADIR TO ANY ADVERSE EMPLOYMENT ACTIONS BECAUSE OF HIS DISABILITY

In addition to the failure-to-accommodate claim, Mr. Quadir also asserts an adverse employment action claim based on two alleged actions by the Department.

First, Mr. Quadir alleges that his supervisor threatened to charge him with insubordination if he refused to teach workshops with the high chair and lectern. *See* Am. Compl., ECF No. 5-2, at 12. But that allegation is insufficient to maintain an adverse employment action claim. As explained above, because Mr. Quadir's limitations were not obvious, and because Mr. Quadir did not give the Department any medical documentation of his alleged limitation on teaching workshops even while sitting down, the Department was not "on notice" of that limitation. *See supra* at 12–20. The Department cannot be liable for discriminating on the basis of a disability of which it was not aware. *See Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 725 (2d Cir. 1994) ("[A]n employer is only responsible for employment decisions based on information available to it when it decides.").

20

Moreover, even if the Department had been aware of Mr. Quadir's alleged limitation, a mere threat to charge him with insubordination — without more, like termination, demotion, a salary cut, loss of benefits, or reduced work responsibilities — is too immaterial as a matter of law to constitute an "adverse employment action." To rise to the level of an "adverse employment action," a change in working conditions must be "'materially adverse'" — that is, "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted). Courts have held that "negative performance evaluations, standing alone, cannot constitute an adverse employment action." *Sweeney v. W.*, 149 F.3d 550, 556 (7th Cir. 1998); *see also Castro-Medina v. Proctor & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 372 (D.P.R. 2008) ("[T]his Court is unable to find that Plaintiff's negative performance evaluation and warnings constitute adverse employment actions. Plaintiff offered no proof that she was materially disadvantaged with respect to her salary, grade or other objective terms and conditions of employment . . . ."). If an *actual* negative performance evaluation falls short of constituting an adverse employment action, then a fortiori the alleged *threatened* insubordination charge here cannot constitute an adverse employment action.

Second, Mr. Quadir alleges that he was assigned to teach workshops while other labor services representatives were not. *See* Am. Compl., ECF No. 5-2, at 12. That claim fails as a matter of law because Mr. Quadir admits that the alleged disparity *predates* the first time that he informed the Department of his disability

in January 2011.[6] Thus, as a matter of law, the Department could not have made those allegedly disparate assignments "*because*" of his disability, as required to maintain an adverse employment action claim.[7] *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) ("To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that . . . *there existed a causal connection between the protected activity and the adverse employment action*.") (emphasis added); *Young v. Westchester Cnty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003) ("[W]here the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation.") (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

---

[6]     *Compare* Am. Compl., ECF No. 5-2, at 1 (first doctor's note to Department was dated Jan. 28, 2011) *with* Am. Compl., ECF No. 5-2, at 15 ("I was assigned to teach the Veterans 8-Week Follow-up Workshop *in October '10*, by the previous Office Manager . . . . I was assigned to teach this class even though I am a Labor Services Representative not a Veteran Services Representative. . . . I taught this workshop until about the end of January '11 (for about 4 months), when I had to be removed from teaching workshops due to my illness . . . .") (emphasis added); Am. Compl., ECF No. 5-2, at 16 (alleging that he was "tricked and ambushed into teaching . . . the Advanced Resume Workshop . . . [*o*]*n Wednesday, January 26, '11*?") (emphasis added and deleted); Am. Compl., ECF No. 5-2, at 16 (alleging that he taught workshops on a weekly basis for two years up to September 2010).

[7]     Indeed, Mr. Quadir admits that the Department assigned him to teach one workshop because of other unrelated personality conflicts within the Department. *See* Am. Compl., ECF No. 5-2, at 12 ("I was assigned to teach the veteran's workshop largely because the previous office manager, Mr. Arthur Merlino, could not get along with veterans' LSR Mr. Juan Serrano.").

22

# POINT III

## MR. QUADIR'S RETALIATION CLAIM SHOULD BE DISMISSED

Finally, Mr. Quadir claims that the Department has retaliated against him in four ways for filing this action: (1) by giving him a number of negative counseling memos, performance evaluations, and write-ups, (2) by erroneously charging him as having taken leave without pay on a state holiday, (3) by refusing to allow him to take unpaid leave to litigate this case, and (4) by giving him a negative performance evaluation in 2014 that prevented him from receiving a pay raise. Supp. Pleading, ECF No. 35, at 26–35. None are actionable.

### A.    The Counseling Memo, Performance Evaluations, and Write-Up Are Too Immaterial To Constitute Adverse Employment Actions

The counseling memo, performance evaluations, and write-up — which did not affect Mr. Quadir's salary, benefits, title, or job responsibilities, *see* Supp. Pleading, ECF No. 35, at 26–28 — are too immaterial as a matter of law to constitute "adverse employment actions" under the Act. *See Sweeney v. W.*, 149 F.3d 550, 556 (7th Cir. 1998) ("[N]egative performance evaluations, standing alone, cannot constitute an adverse employment action."); *Morales v. Ga. Dep't of Human Res.*, 446 F. App'x 179, 183–84 (11th Cir. 2011) (employer's documentation of counseling was not adverse employment action where it did not affect employee's salary, job status, or future pay raises); *Castro-Medina v. Proctor & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 372 (D.P.R. 2008).

Moreover, Mr. Quadir does not allege beyond a bare conclusion that the Department issued those negative reviews "because" he filed this lawsuit, as required to maintain a retaliation claim under the Act. *See* 42 U.S.C. § 12203(a); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). The totality of his allegations are: (1) the reviews were false, (2) the April 2012–April 2013 performance evaluation was "clear[ly]" intended "to portray [him] in the darkest possible light . . . [and] as someone who contributes very little in terms of the work and productivity of the Bronx DOL office," and (3) the reviews were "acts of retaliation against [him] for exercising [his] legal rights under the ADA." ECF No. 35, at 26. Those allegations are too conclusory to establish a causal connection between the performance reviews and this action. *See Goldblatt v. Geiger*, 867 F. Supp. 2d 201, 211–12 (D.N.H. 2012) (dismissing retaliation claim because although complaint alleged that defendant's proffered reasons for adverse action were pretextual, complaint suggested that proffered reasons were merely incorrect, not pretextual, and thus insufficient to allege causal connection).

**B.    The Department's Unsuccessful Attempt To Deny Mr. Quadir Pay For a State Holiday Is Also Too Immaterial To Constitute an Adverse Employment Action**

Likewise, because it was admittedly unsuccessful, the Department's alleged attempt to deny Mr. Quadir pay on a state holiday is too immaterial as a matter of law to constitute an "adverse employment action." *See supra* at pp. 21, 23.

In addition, Mr. Quadir admits that he does not know whether his supervisor's alleged attempt to deny him pay was related in any way to this

lawsuit.[8] An admission that the plaintiff *does not know why* an employer took an

allegedly adverse employment action falls short of alleging that the employer took

that action "because" the employee filed a lawsuit. *See supra* at p. 24.

### C.  The Department Is Not Liable For Denying Mr. Quadir's Request For an Exemption From Its Normal Leave Policy To Litigate This Case

Nor is the Department liable for denying Mr. Quadir unpaid leave time to

litigate this case. Supp. Pleading, ECF No. 35, at 30. The Act does not entitle

employees to engage in protected activity (like litigating a claim under the Act)

during work hours. *See NLRB v. Rockaway News Supply Co.*, 197 F.2d 111, 112–14

(2d Cir. 1952) ("[A]n employee is of course free to [engage in protected activity]

when he is on his own time and his discharge for so doing would doubtless be

[unlawful]. But he is not free to [engage in protected activity] during his working

time in violation of his employer's working rules by refusing to perform . . . part of

his regular duties . . . . To hold otherwise would be to permit an employee

unilaterally to dictate the terms of his employment which it is well settled he may

not do.") (footnotes omitted).

---

[8]     *See* Consol. Supp. Pleading, ECF No. 35, at 27 ("[I]t is simply not known why Ms. Ramos deliberately changed the preset and pre-filled Feb. 17th paid holiday entry in order to charge me as leave without pay for Washington's Birthday. Was this a genuine error on her part as she claimed in an email entitled 'RE: Monday, Feb. 17, '14 State Holiday?' she sent me on Friday, March 7, '14 at 4pm? Or was this a deliberate act of retaliation against me for exercising my legal rights under the ADA? The only way I can know for sure is if the Court denies the Dept.'s dismissal motion and allows me to proceed further with this case . . . .") (emphasis deleted).

Moreover, Mr. Quadir does not allege beyond a bare conclusion that the Department denied him leave "because" he filed this action. *See supra* at p. 24.

**D.    The 2014 Performance Evaluation Is Not an Actionable Act of Retaliation Because Mr. Quadir Fails To Allege Any Causal Connection Between That Evaluation and This Action**

Finally, Mr. Quadir's retaliation claim based on the negative performance evaluation in 2014 that prevented him from receiving an automatic pay raise should be dismissed because he fails to allege beyond a bare conclusion that the performance evaluation was related to his filing of this action. Supp. Pleading, ECF No. 35, at 32 (sole alleged connection is that evaluation was "of course . . . a deliberate act of retaliation against me for exercising my rights under the ADA"). Without any alleged facts giving rise to an inference that the Department gave him the negative evaluation "because" he filed this action, Mr. Quadir's claim must be dismissed. *See supra* at p. 24.

## CONCLUSION

For these reasons, Mr. Quadir's consolidated pleading should be dismissed.

Dated:      New York, New York          Respectfully submitted,
            June 20, 2014

                                        ERIC T. SCHNEIDERMAN
                                        New York State Attorney General
                                        *Attorney for Defendant*

                                        By:

                                         /s/
                                        _____
                                        Garrett Coyle
                                        Assistant Attorneys General
                                        120 Broadway, 24th Floor
                                        New York, New York 10271
                                        (212) 416-6696
                                        (212) 416-6009 fax
                                        Garrett.Coyle@ag.ny.gov