UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                   :

MOHAMMED QUADIR,                  :
                                                 :

                              Plaintiff,   :          13-CV-3327 (JPO)
                -v-                     :
                                                 :         OPINION AND ORDER

NEW YORK STATE DEPARTMENT OF    :
LABOR,                            :
                                               :
                           Defendant.  :
                                               :
------------------------------------------------------------X

J.  PAUL OETKEN, District Judge:

      Plaintiff Mohammed Quadir brings this action against his employer, the New York State

Department of Labor (the "Department").  Proceeding *pro se*, he alleges that the Department

failed to make reasonable workplace accommodations for his disability, took adverse

employment action against him because of that disability, and retaliated against him for

complaining about disability discrimination, all in violation of the Americans with Disabilities

Act, ("ADA") 42 U.S.C. §§ 12101 *et seq.*, and the New York State and City Human Rights Laws

("NYSHRL" and "NYCHRL," respectively), N.Y. Exec. Law §§ 290–97; N.Y. City Admin.

Code § 8–101.  The Department has moved to dismiss Quadir's Amended Complaint ("Am.

Compl.") and Comprehensive Consolidated Supplemental Pleading for lack of subject matter

jurisdiction and failure to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

Quadir has also filed an application for pro bono counsel with this Court.  For the reasons that

follow, the motion to dismiss is granted in part and denied in part, and Quadir's motion for pro

bono counsel is denied without prejudice.

# I.      Background[1]

Quadir joined the Department as a Labor Services Representative ("LSR") in the Department's Bronx office in April 2008.  His job chiefly involves conducting interviews with New York unemployment benefit recipients.  Since around July 2008, Quadir has also taught workshops on resume writing and other job-market skills to groups of between five and 60 unemployed people in a classroom at the Department office.  These workshops last between 30 minutes and four hours.

Not every LSR teaches these workshops.  Indeed, of the 18 LSRs at the Bronx office, six have not taught any workshops since at least 2008, and eight teach workshops only about once a month.  Quadir is one of two or three LSRs who teach the bulk of the workshops.  Teaching is an unenviable task as many of the participants attend only because they are required to do so to receive their unemployment benefits.  Many are frustrated and upset at having lost their jobs and some take those feelings out on Department staff.  For these reasons, LSRs "try to avoid or get out of" teaching workshops when they can.  (Dkt. No. 5-2 at 11).

In late 2010, Quadir went to the doctor complaining of fatigue, headaches, difficulty concentrating, lightheadedness, and dry, tired, and sleepy eyes.  The doctor made no diagnosis but referred him to specialists for further examination.  On February 2, 2011, Quadir submitted notes to the Department from both a cardiologist and primary care physician excusing him from public speaking and prolonged standing for two months.  He asked to be excused from teaching

---

[1] Except where noted, these facts are drawn from the Plaintiff's Amended Complaint and Comprehensive Consolidated Supplemental Pleading.  This Court "accepts all well-pleaded facts in the Complaint and Supplemental Pleading as true for the purpose of ruling on a motion to dismiss."  *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 222 (S.D.N.Y. 2010).

workshops.  The Department granted this request and excused him from all workshop teaching responsibilities for three months.

On April 14, 2011, after the first accommodation request expired, Quadir submitted another note from a neurologist that listed Quadir's symptoms and again asked for him to be exempted from work that involved prolonged standing.  Along with this note, he submitted his own written explanation of his symptoms and a request for the same accommodation: no workshop teaching.  The Department responded by asking for more documentation of Quadir's request, and Quadir submitted another note from his neurologist as well as a two-page letter of his own explaining why he felt he could not teach workshops even sitting down.

The Department excused Quadir from teaching any workshops for a second time, through August 2011.  In August, Quadir again brought in a note from his neurologist that made no diagnosis but excused him from teaching, this time until December 2011.  The Department granted this request for an extension as well.

On December 20, Quadir requested a fourth extension of his accommodation and brought a note from a different doctor, this time a psychiatrist.  The psychiatrist had diagnosed him with Major Depressive Disorder and, like the other doctors, asked that Quadir be excused from work involving prolonged standing and physical exertion.  An administrator within the Department either ignored or mishandled this request and did not reply to Quadir until January 26, 2012, allowing his previous accommodation period to end.  When he did reply, he asked Quadir to fill out another form requesting accommodation.  Union intervention led the administrator to withdraw this request and excuse Quadir from teaching workshops while the Department considered the merits of the new request.

On February 14, 2012, the Department denied Quadir's request, claiming for the first time that teaching workshops was an essential function of Quadir's job.  As an alternative accommodation, it offered him the use of a "high chair" and lectern while teaching.  (Dkt. No. 5-5 at 44).  Quadir's immediate supervisor, Noemi Ramos, told him that failure to teach workshops would be considered insubordination.  Later notes from Quadir's psychiatrist indicated that Quadir should be excused from all group teaching because of his symptoms, but the Department did not change its decision.

Quadir decided to file a charge with the New York State Division of Human Rights challenging this denial.  The Division of Human Rights dismissed the charge in December 2012 and concluded that a "high chair" and lectern would constitute reasonable accommodations.  Quadir then filed this action, asking for, among other things, an order from this Court requiring the Department to grant his requested accommodation.

After this lawsuit was filed, in April 2014, Quadir was given a negative annual performance evaluation that prevented him from receiving an otherwise automatic salary increase.  He believes that this performance evaluation and several others made over the course of 2013 and 2014 are false and retaliatory.

## II.    Pleading Standard

To survive a motion to dismiss for failure to state a claim, plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  A claim is facially plausible when plaintiffs plead facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "Courts must accept as true all well-pleaded factual allegations in the complaint, and 'draw [ ] all inferences in the plaintiff's favor.'"  *Goonan v. Fed. Reserve*

*Bank of New York*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts must afford *pro se* plaintiffs "special solicitude" before granting motions to dismiss or motions for summary judgment.  *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994).  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  "This policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (internal quotations and modifications omitted).  Therefore, courts read *pro se* filings "to raise the strongest arguments that they suggest." *Id.* at 474.

## III.  Discussion

### A.    Eleventh Amendment Immunity

#### 1.    The ADA

The sole defendant in this case is an agency of the State of New York.  The Eleventh Amendment bars suits against state agencies unless the state waives its sovereign immunity or it is validly abrogated by Congress.  *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429–31 (1997).  It is well settled that states retain their sovereign immunity against discrimination

claims brought under Title I of the ADA.  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531

U.S. 356, 374 (2001).  And district courts within this Circuit have consistently extended

*Garrett*'s holding to ADA Title V retaliation claims—at least to the extent that those claims are

predicated on ADA Title I discrimination claims.  *See Morales v. New York*, 13-CV-2586 (NSR),

2014 WL 2158979 (S.D.N.Y. May 22, 2014); *Clark v. New York State Office of State*

*Comptroller*, 09-CV-716 (GLS/CFH), 2014 WL 823289 (N.D.N.Y. Mar. 3, 2014); *Davis v.*

*Vermont, Dep't of Corr.*, 868 F. Supp. 2d 313, 322 (D. Vt. 2012); *Perciballi v. New York*, 09-

CV-6933 (WHP), 2010 WL 3958731 (S.D.N.Y. Sept. 28, 2010); *Padilla v. New York State Dep't*

*of Labor*, 09-CV-5291 (CM) (RLE), 2010 WL 3835182 (S.D.N.Y. Sept. 13, 2010) ("[E]very

district court in this Circuit to consider the issue has concluded that sovereign immunity bars

Title V claims."); *Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 408 (E.D.N.Y.

2010); *Moshenko v. State Univ. of New York at Buffalo*, 07-CV-0116 (RJA) (JJM), 2009 WL

5873236 (W.D.N.Y. Sept. 16, 2009); *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d

316, 323 (N.D.N.Y. 2009) (holding that "[i]f a state is immune from underlying discrimination,

then it follows that the state must be immune from claims alleging retaliation for protesting

against discrimination"); *see also Demshki v. Monteith*, 255 F.3d 986, 988 (9th Cir. 2001) ("We

recognize that *Garrett* arose in the context of Title I, but we nevertheless conclude that the

Court's holding necessarily applies to claims brought under Title V of the ADA, at least where,

as here, the claims are predicated on alleged violations of Title I.")  Therefore, Congress has not

abrogated New York's sovereign immunity for the purposes of ADA claims like Quadir's.

  Further, the New York Legislature has never waived its sovereign immunity from

liability under Titles I and V of the ADA.  The simple fact that New York has passed its own

analogous disability protections does not constitute a waiver, as states waive immunity "only

where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239–40 (1985) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). The New York Legislature has considered such a waiver, but has never enacted one. *See, e.g.*, N.Y. Senate Bill S2362-2013.

Because Congress has never abrogated New York's sovereign immunity from claims under Titles I and V of the ADA and New York has never waived it, all of Quadir's ADA claims are barred by the Eleventh Amendment, and are consequently dismissed.

If the complaint is read with special solicitude so as to raise the strongest possible legal arguments on the facts as alleged, however, it may state a claim under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794.  As amended, the Rehabilitation Act imports the discrimination standards of Title I of the ADA and the retaliation standards of Title V.  *See* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 . . . .").  And "[b]ecause the Rehabilitation Act was enacted pursuant to the Spending Clause of Article I, Congress can require states to waive their sovereign immunity [for Rehabilitation Act claims] as a condition of accepting federal funds." *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 414, *on reconsideration*, 452 F. Supp. 2d 328 (S.D.N.Y. 2006).  Since the Rehabilitation Act does include such a requirement and New York does accept federal funds, "New York has waived sovereign immunity with respect to [Rehabilitation Act] claims." *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011); *see* 29 U.S.C. § 794(a).  Accordingly, Quadir's putative

federal law claims survive sovereign immunity analysis because, construed liberally, they arise under the Rehabilitation Act.

### 2. The NYSHRL

Quadir also makes claims under the NYSHRL, which parallels the ADA in its substantive legal standards. *Goonan*, 916 F. Supp. 2d at 478. This cause of action also runs aground on sovereign immunity because "New York has not waived its Eleventh Amendment immunity for NY[S]HRL suits in federal courts." *Widomski v. State Univ. of New York (SUNY) at Orange*, 933 F. Supp. 2d 534, 554 (S.D.N.Y. 2013), *aff'd*, 748 F.3d 471 (2d Cir. 2014); *see also Atascadero*, 473 U.S. at 241 (Powell, J.) ("The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment . . . . In the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction, we decline to find that [a state] has waived its constitutional immunity."); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (Powell, J.) ("[A] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued.") (emphasis in original); *Serrano v. New York State Dep't of Envtl. Conservation*, 12-CV-1592 (MAD) (CFH), 2013 WL 6816787 (N.D.N.Y. Dec. 20, 2013) (holding that the NYSHRL does not waive the New York's Eleventh Amendment immunity to suit in federal court); *Smith v. State Univ. of New York,* No. 00–CV1454, 2003 WL 1937208, at *7 (N.D.N.Y. Apr. 23, 2003) ("[T]he district courts in this Circuit have repeatedly held that the New York Human Rights Law does not include a waiver of the State's sovereign immunity to suit in federal court." (internal quotation marks omitted)); *Tuckett v. N.Y. State Dep't of Tax. & Fin.,* No. 99–CV–0679, 2000 WL 1028662, at *2 (S.D.N.Y. July 26, 2000) ("[N]othing in the text of the [NYS]HRL constitutes a waiver of immunity or consent to be

sued."); *Arroyo v. New York State Ins. Dep't*, 91-CV-4200 (MBM), 1993 WL 248210 (S.D.N.Y.

June 30, 1993) ("[I]t seems that if the New York legislature had intended to waive its sovereign

immunity to claims brought under the New York Human Rights Law, it would have used more

specific waiver language than appears in that statute.")  For this reason, Quadir's claims under

the NYSHRL must be dismissed.

### 3.      The NYCHRL

The Eleventh Amendment likewise bars claims against the State of New York under the

City law.  "The City of New York does not have the power to abrogate the immunity of the state,

and we have found no evidence that the state has consented to suit in federal court under the

NYCHRL."  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2013); *see also Campbell v. City*

*Univ. Const. Fund*, 98-CV-5463 (JSM), 1999 WL 435132 (S.D.N.Y. June 25, 1999) (holding

that the Eleventh Amendment bars NYSHRL and NYCHRL claims against a state agency in

federal court).  Accordingly, Quadir's claims under the NYCHRL also must be dismissed.

After applying this sovereign immunity analysis with special solicitude to Quadir's *pro se*

pleadings, three claims survive, all arising under the Rehabilitation Act: (1) failure to reasonably

accommodate a disability, (2) adverse employment action because of a disability, and (3)

retaliation for complaining about disability discrimination.

### B.      Reasonable Accommodation

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability

in the United States . . . shall, solely by reason of her or his disability, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."  29 U.S.C. § 794.  "Apart from the Rehabilitation

Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only

federally funded—as opposed to 'public'—entities, these provisions purport to impose precisely the same requirements" as the ADA and are analyzed under the same legal standards.  *Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167 (2d Cir. 1998).  The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [its] business."  42 U.S.C. § 12112(b)(5)(A).  Similarly, regulations promulgated under the Rehabilitation Act by the Department of Health and Human Services require recipients of federal funds to "'make *reasonable accommodation* to the known physical or mental limitations of an otherwise qualified handicapped . . . employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.'"  *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995) (quoting 45 C.F.R. § 84.12(a) (1994)).

An employee suing for failure to make such reasonable accommodations must establish four elements to make a *prima facie* case: "(1) plaintiff is a person with a disability under the meaning of the [Rehabilitation Act]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."  *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).  Thus, the reasonability of any proposed accommodation is generally a fact question to be investigated through discovery.

The Department focuses chiefly on the second element, contending that it could not have had notice that Quadir's illness prevented him from teaching workshops because the December 2011 doctor's note that he provided excused him only from "prolonged standing and physical exertion," not teaching altogether.  (Dkt. No. 5-5 at 39).  But the Department granted previous requests based on doctors' notes with similar language.  Further, the February 2011 doctor's note had excused Quadir from all public speaking based on the same symptoms, and in July 2011 Quadir himself had written an extensive, medically supported letter to Department management explaining why he believed he could not continue to teach.  It is not clear what relevant considerations changed between August 2011, when Quadir's last accommodation extension was granted based on a doctor's note that mentioned only "prolonged standing work duties," and February 2012, when his request was bolstered by a specific diagnosis of Major Depressive Disorder.  (Dkt. No. 35 at 9.)  The fact that Quadir was given a diagnosis does not add to his burden to describe his symptoms.  That the Department may have run out of patience with Quadir after a year of accommodations provides no justification under the law.

The Department's reliance on a list of cases in which employees fail to document relevant limitations likewise cannot rescue their attempt to dismiss Quadir's claim.  Medical documentation need not exhaustively list an employee's workplace limitation to raise a plausible inference of notice.  Here, the December 2012 note set out Quadir's limitations in much the same way as prior notes, which had apparently put the Department on notice of his alleged need to be excused from teaching workshops.  And contrary to the Department's suggestion, the duty of an employer to determine what accommodations would be reasonable does not end with "taking [a] new doctor's note at face value," divorced from any context or history.  (Def.'s Mem., 18.)  Instead, the Equal Employment Opportunity Commission ("EEOC") regulations issued pursuant

to the ADA, which are informative to resolution of claims under the Rehabilitation Act, contemplate an ongoing, informal, and interactive process that "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2. To isolate the cause of a failure in this interactive process, courts make a fact-sensitive and case-by-case inquiry into the *good faith* and *reasonable efforts* of the parties in light of the complete set of circumstances. *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996). "At the very least . . . an employee who proposes an accommodation . . . triggers a responsibility on the employer's part to investigate that request and determine its feasibility." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000). These principles indicate that "[w]hat matters under the ADA [and Rehabilitation Act] are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, *under the circumstances*, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (emphasis added). Here, based on the allegations, it is not clear that the Department discharged its obligations to participate in the interactive process. It would not be appropriate to resolve these highly fact-sensitive issues on a motion to dismiss. Drawing all inferences in Quadir's favor from the facts as pleaded and considering all of the circumstances, the Court cannot conclude that the Department had no notice of Quadir's disability as a matter of law.

Even if it did not, however, Quadir's reasonable accommodation claim would still survive dismissal. Quadir alleges that the psychiatrist who made the December 2011 diagnosis sent other notes in 2012 clarifying that he should be excused from "group instruction assignments sitting or standing with or without the use of a lectern." (Dkt. No. 5-7 at 2). These

12

further affirmative steps in the interactive process appear to raise a plausible inference that, at least by August 2012, the Department was on notice of Quadir's alleged need to be excused from teaching workshops.

Construed liberally in his favor and taken as true, then, Quadir's pleadings raise a plausible inference that the Department failed to reasonably accommodate him in violation of the Rehabilitation Act.  It is worth noting here that the denial of a motion to dismiss a *pro se* complaint "express[es] no opinion regarding the merits of [Plaintiff]'s claim. And that is precisely the point: even after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."  *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008).

For these reasons, the Department's motion to dismiss as to the reasonable accommodation claim is denied.

### C.    Disability Discrimination

Quadir also contends that the Department discriminated against him because of his disability apart from denying him reasonable accommodations.  Because discrimination is rarely so open as to provide direct proof, a plaintiff is required only to prove four circumstantial elements to make out a *prima facie* Rehabilitation Act discrimination claim: "(1) plaintiff's employer is subject to the [Rehabilitation Act]; (2) plaintiff was disabled within the meaning of the [Rehabilitation Act]; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability."  *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (citation and brackets omitted).  The Department does not contest the first three elements.  Instead, it seeks to show that, even on the facts that Quadir has pleaded, he did not

13

suffer an adverse employment action because of his disability.  Quadir mentions two incidents

that cannot rise to the level of an adverse employment action.  But Quadir's complaint can be

read to allege that his April 2014 annual performance review, which denied him an otherwise

automatic raise, was discriminatory.  Taken in this light, Quadir states a claim for discrimination.

First, Quadir points out that he was required to teach workshops while many others with

the same job title were not.  According to Quadir's pleadings, assigning workshops only to some

LSRs at the Bronx office has been the Department's policy for some time.  While this may tend

to show that Quadir's requested accommodation was reasonable, it cannot constitute an adverse

employment action.  It is well settled that there must be some causal connection between a

protected activity—such as asking for reasonable accommodation—and the ultimate adverse

action.  And "where the adverse action was already ongoing at the time of the protected activity,

or is very similar to another adverse action that was taken before the protected activity, with no

other change in relevant circumstances, logic precludes any inference of causation."  *Young v.

Westchester Cnty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003).

Second, Quadir alleges that his supervisor threatened to "charge him with

insubordination" if he continued to refuse to teach workshops after his request was denied.  (Dkt.

No. 5-2 at 12).  But "adverse employment action" entails a "materially adverse *change* in the

terms and conditions of employment."  *Sanders v. New York City Human Res. Admin.*, 361 F.3d

749, 755 (2d Cir. 2004) (emphasis added; citation and internal quotation marks omitted).  The

mere mention of a possible response to disfavored behavior does not itself change the terms and

conditions of employment.  For that reason, "[t]he law in this Circuit is clear that the threat of

disciplinary action, without more, does not constitute an adverse employment action."  *Henry v.

NYC Health & Hosp. Corp.*, 13-CV-6909 (PAE), 2014 WL 957074 (S.D.N.Y. Mar. 10, 2014)

(collecting cases).  Even if Quadir's supervisor had made some sort of negative mark on his record indicating insubordination, this would not be enough to constitute a materially adverse employment action.  To show a materially adverse action, the relevant change in conditions of employment "must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities . . . ."  *Sanders*, 361 F.3d at 755 (citation and quotation marks omitted).

Finally, Quadir alleges that the negative annual performance evaluation issued in April 2014 was baseless and that this evaluation denied him an otherwise automatic pay increase.  Although he does not explicitly allege that this act was discriminatory, a solicitous reading of the complaint suggests that it could have been.

An adverse employment action involves some employer act or omission that constitutes or causes a material change in terms and conditions of employment.  Here, the Department took a deliberate and specific action—the negative performance evaluation—that had the direct effect of lowering Quadir's compensation relative to his legitimate expectations.  Failure to raise pay or grant a bonus does not ground a claim of employment discrimination without more.  *See, e.g.*, *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 134 (E.D.N.Y. 2012) (failure to extend a further spontaneous raise to employee who had received 20 raises over the course of his employment cannot ground discrimination claim on its own.)  But when the expectation of a raise is legitimate because a raise is automatic in the absence of employer action, a baseless or arbitrary move to deny such a raise is a material change in the terms or conditions of employment that may give rise to an inference of discrimination.  *See, e.g.*, *Fullwood v. Ass'n for the Help of*

*Retarded Children, Inc.*, 08-CV-6739 (DAB), 2010 WL 3910429 (S.D.N.Y. Sept. 28, 2010)

(recognizing that denial of a raise may be adverse employment action when the raise is

"customary, expected, or warranted"). *Cf. Martires v. Connecticut Dep't of Transp.*, 596 F.

Supp. 2d 425, 440 (D. Conn. 2009) ("Being denied the opportunity to work overtime may

constitute an adverse employment action." (citing *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d

Cir. 2006))

Summary judgment may well show that the Department was undisputedly correct in its

assessment of Quadir's performance and justified in denying him a raise. But Quadir, a *pro se*

plaintiff, has alleged that the performance evaluation was "inaccurate, misleading, and in some

instances flat-out false," citing specific factual discrepancies and evaluation procedures that he

claims were not followed. (Dkt. No. 35 at 30.) This is enough to raise an inference that there

was a causal connection between Quadir's alleged disability and the Department's evaluation.

And the Department, to which no special solicitude is due, fails to argue that any legitimate or

non-discriminatory reasons motivated the adverse April 2014 performance evaluation. Quadir

has met his minimal burden, and the Department's motion to dismiss as to Quadir's

discrimination claim therefore will be denied.

### D.   Retaliation

Quadir also contends that the Department retaliated against him several times for

asserting his rights under the Rehabilitation Act. Among other things, he alleges that the April

2014 annual performance evaluation described above was retaliation for pursuing this action.

The ADA and Rehabilitation Act prohibit employer retaliation against employees who

assert their rights under their terms. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate

against any individual because such individual . . . made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this chapter"). To make out a case for retaliation, a plaintiff must show "(1) she engaged in an activity protected by the [Rehabilitation Act]; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity," that is, the employer acted with a retaliatory motive. *Caskey v. Cnty. of Ontario*, 560 F. App'x 57 (2d Cir. 2014) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); internal brackets omitted); *see also Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148–49 (2d Cir. 2002).

The standard for an "adverse employment action" in a retaliation claim, however, is not as demanding as it is in a discrimination claim. In the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This Circuit has long "defined adverse employment action broadly to include . . . reduction in pay[] and reprimand." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (internal quotation marks omitted). "A plaintiff's burden at this prima facie stage is de minimis." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

The Department's sole argument for dismissal of Quadir's retaliation claim is that the allegations of a retaliatory motive are too conclusory. It makes no attempt to assert some other, non-retaliatory motive and fails to address the fact that this performance evaluation, unlike the others, may be materially adverse because it affected Quadir's pay. At this early stage, Quadir is not required to plead specifics about the internal motivations of Department supervisors that he could establish only through discovery. He contends in his pleadings that the Department did not

follow normal training and evaluation procedures and later adds that his negative evaluation was "of course" retaliatory.  (Dkt. No. 35 at 32.)  Liberally construed, this is enough to give rise to a plausible inference that the Department was retaliating against him.  Accordingly, the Department's motion to dismiss as to Quadir's retaliation claim will be denied.[2]

## IV.    Application for Pro Bono Counsel

On July 25, 2014, Quadir filed an application for pro bono counsel with this Court.  In determining whether to grant an application seeking appointment of counsel, the Court must consider "the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel."  *Cooper v. A. Sargenti Co.*, Inc., 877 F.2d 170, 172 (2d Cir. 1989) (per curiam).  As a threshold matter, in order to qualify for appointment of counsel plaintiff must demonstrate that his claim has substance or a likelihood of success.  *See Hodge v. Police Officers*, 802 F.2d 58, 60-61 (2d Cir. 1986).  In addition, in reviewing a request for appointment of counsel, the Court must be cognizant of the fact that volunteer attorney time is a precious commodity, and thus, should not grant appointment of counsel indiscriminately. *Cooper*, 877 F.2d at 172.

At the motion to dismiss stage, it is too early to adequately weigh the merits of Quadir's case.  A more fully developed record will be necessary before the Court can determine whether Quadir's chances of success warrant the appointment of counsel.  Accordingly, Quadir's application for the appointment of counsel is denied without prejudice to renewal at such time as the existence of a potentially meritorious claim may be demonstrated.

---

[2] Because Quadir's allegations concerning his 2014 performance evaluation succeed in stating a claim for retaliation under the Rehabilitation Act, it is unnecessary to analyze other, less tenable grounds that he has mentioned.

## V.      Conclusion

For the foregoing reasons, the Department's motion to dismiss is GRANTED in part and DENIED in part.  Quadir's claims under the NYSHRL and NYCHRL are dismissed on the basis of sovereign immunity.  The Department's motion is denied as to Quadir's reasonable accommodation, discrimination, and retaliation claims, which are construed as claims under the Rehabilitation Act.  Quadir's motion for pro bono counsel is denied without prejudice, and his request to file a sur-reply is denied as moot.

The Clerk of Court is directed to close the motions at Docket Numbers 14, 38, and 51.


SO ORDERED.


Dated: August 19, 2014
       New York, New York


_____
                J. PAUL OETKEN
             United States District Judge


Copies mailed by chambers to Pro Se party on 8/19/2014